Clifford R. NICHOLSON, Plaintiff,

v.

KENT COUNTY SHERIFF'S DEPARTMENT, Deputy Edward Droski, Deputy John Rikans, Deputy Robert Vanderlaan, Lieutenant Jack Christensen, Detective Harlow Blumenstein, Detective Sergeant William Weston, Detective Gerald Miedema, Detective Robert Peters, Detective David Barnes, and Other Unknown Officers, Defendants.

No. 1:92–CV–649.

United States District Court, W.D. Michigan, S.D.

Nov. 29, 1993.

Robert D. VanderLaan, Miller, Canfield, Paddock & Stone, Grand Rapids, MI, for plaintiff.

Timothy E. Eagle, Peter A. Smit, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, MI, for defendants.

## OPINION

QUIST, District Judge.

Plaintiff brought this civil rights action against defendants, Kent County Sheriff's Department, Deputy Edward Droski, Deputy John Rikans, Deputy Robert VanderLaan, Captain Jack Christensen, Detective Harlow Blumenstein, Detective Sergeant William Weston, Detective Gerald Miedema, Detective Robert Peters, Detective David Barnes and other unknown officers who were involved in arresting the plaintiff on October 19, 1990, at the Forest View Hospital in Grand Rapids, Michigan. This matter is before the Court on the defendants'[1] motion for summary judgment.

## BACKGROUND FACTS

Plaintiff Clifford Nicholson is a 37 year-old man who has been diagnosed as having a bipolar chemical imbalance. On the morning of October 19, 1990, plaintiff was apparently suffering from a "manic episode" which caused him to become grossly agitated and paranoid. Plaintiff walked out of a scheduled appointment with his psychiatrist, Dr. Steven Berger, and proceeded to nearby Forest View Hospital. Plaintiff entered the lobby of the hospital and tried unsuccessfully to open a locked door which led from the reception area into the "secure" area of the hospital. He then turned to a glass reception window. Plaintiff broke the window with his hands. He climbed through the window, injuring the pregnant receptionist.

After gaining access to the administrative area of the hospital, plaintiff began breaking windows and smashing whatever happened to be in his path. Plaintiff entered a hallway which extended approximately 100 feet north and then doglegged to the west about thirty feet. The emergency entrance to the hospital was located at the north end of the hallway. At the south end of the hallway were swinging doors which led into the din-

---

known officers" named by the plaintiff in his complaint.

ing/kitchen areas and eventually into the patient living area of the hospital.

Plaintiff repeatedly called out for a woman named Nancy Elliott and yelled that he was "the baddest mother-fucker around." Plaintiff threw things and smashed windows. Defendants contend that plaintiff used his head, as well as his hands, to break steel reinforced windows. Plaintiff disputes this allegation and insists that although the evidence reveals he used his head to strike the glass, the impact caused the glass to crack but not to break.[2]

Forest View staff members were frightened by the plaintiff and tried to escape the area. Some staff members were able to leave the building, while others hid in offices. A few Forest View workers escaped behind doors at the south end of the hallway and tried to physically keep the doorways shut in order to prevent plaintiff from entering other areas of the hospital. At one point, plaintiff tried to enter the patient living area. Forest View workers tried to hold the door shut with their bodies. Plaintiff's hand became pinned in the door as he tried to force it open and he called out, "You're smashing my hand, guys."

One of the Forest View workers telephoned "911." Detective Harlow Blumenstein and Deputy Robert VanderLaan initially responded to the call. Detective William Weston, Deputy John Rikans and Deputy Ed Droski arrived shortly thereafter. Upon their arrival at the hospital, the officers observed that the east-facing windows had been broken. Files, furniture and office equipment had been thrown onto the sidewalk. The officers were able to see the plaintiff, his head covered with blood, hanging out of a window. An ambulance was requested.

The officers attempted to gather information from the Forest View workers who were standing in the parking lot. The officers learned that most people had gotten out of the hospital hallway where the plaintiff was located. However, the Forest View staff did not know if anyone remained within the plaintiff's immediate vicinity.

Deputy Rikans walked towards the northeast door and was confronted by the plaintiff who yelled, "If you want me, you're going to have to shoot me." The plaintiff's hands and face were covered with blood and he threw a flower pot out of the window towards Deputy Rikans.

After assessing the situation, the officers decided to enter the building. Prior to doing so, they unloaded their exposed sidearms. However, Detective Weston decided not to "drop his ammunition" based, in part, upon his reluctance to enter the hospital without knowing whether plaintiff had any items which could be used as weapons. Plaintiff contends that this was a violation of Sheriff Department policy. Three officers carried collapsible ASP steel batons[3] and entered the building ahead of the remaining officers. They entered the lobby accompanied by a Forest View staff member who unlocked the door which led from the lobby into the hallway.

The officers proceeded northward through the hallway. Detective Weston and Deputy Droski had their ASP batons extended but hidden behind their legs. Deputy Rikans' ASP baton was closed. The remaining officers, Detective Blumenstein and Deputy VanderLaan followed behind them.

Plaintiff suddenly appeared from the doglegged portion of the hallway. His head was bloodied and he was shirtless. The officers identified themselves as police and told the plaintiff to "Get back" "Get down" "Lie down". Plaintiff, however, continued to approach the officers. He told them he was Jesus Christ, that he was there for the second coming and wanted to "get it on" with them. Plaintiff approached the officers in a

---

**2.** Plaintiff cites deposition testimony of four individuals. Two witnesses testified that they did not observe the plaintiff hitting any glass with his head. The third witness, Blake Richards, testified that on one occasion he saw the plaintiff hit his upper forehead on a piece of glass and the impact left an imprint on the glass. The remaining witness, Mary Bennett, testified that she observed the plaintiff hit his head on reinforced glass. The glass cracked in a spider web pattern but did not shatter until he hit it with his hands.

**3.** After viewing an ASP baton, I find it is a steel pipe capable of inflicting serious injury.

boxer's crouch with his fists clenched. Upon reaching the officers, he began striking them.

Deputy Rikans testified in deposition that he hit plaintiff with his ASP baton two times. His first swing hit plaintiff's hand. His second swing hit the plaintiff's arm. According to Deputy Rikans, the blows did not affect the plaintiff who proceeded to hit Deputy Rikans in the head. The force of the plaintiff's blow lifted Deputy Rikans off the ground and he landed on his back.

As plaintiff continued to strike at the officers, Deputy VanderLaan attempted to grab the plaintiff's lower body and take his feet out from underneath him. His attempt failed, however, when plaintiff struck him twice on the head and knocked him to the ground. Deputy VanderLaan got up dazed and then assisted Deputy Rikans out of the hallway and into the main lobby. Detective Blumenstein also left the hallway and asked Deputy Rikans to radio for more assistance.

Deputy Droski and Detective Weston remained in the hallway and attempted to fend off the plaintiff's attack with their batons. Deputy Droski has testified that he hit the plaintiff with his baton a total of four times. According to Deputy Droski, none of the swings hit plaintiff in the head. The plaintiff struck Deputy Droski on the face, knocking him to the ground, puncturing his eardrum and shattering his glasses. The impact also caused Deputy Droski to lose his baton. As Deputy Droski lay on the floor, plaintiff began kicking him. The fallen deputy responded by kicking upward into plaintiff's groin. Detective Weston, the remaining officer, tried to protect Deputy Droski by hitting the plaintiff on the head with his baton.

Detective David Barnes arrived and entered the north end of the hallway. Plaintiff pursued him, which allowed Detective Weston to assist the injured Deputy Droski into the lobby where he could receive medical attention.

As plaintiff moved to the north end of the hallway, other officers entered. Detective Barnes, Detective Weston, Deputy VanderLaan and Detective Blumenstein positioned themselves within a few feet of the plaintiff. Plaintiff wiped blood from his forehead, flicked it at the officers and resumed a boxer's stance with his fists raised. He then charged towards Deputy VanderLaan saying, "Let's go. Round two."

Deputy VanderLaan picked up a fire extinguisher that plaintiff had ripped from the wall and sprayed it at the plaintiff. After catching his breath, plaintiff again charged at the deputy. Once again, Deputy VanderLaan discharged the fire extinguisher in the direction of the plaintiff. Plaintiff then turned towards a water fountain which was mounted on the wall. Detective Barnes and Detective Robert Peters, who had just arrived, grabbed the plaintiff's legs. As the officers tried to pull plaintiff's legs out from under him, plaintiff grabbed the water fountain and ripped it off the wall as he fell. It took eight officers to handcuff the plaintiff and secure his ankles to prevent him from kicking. Plaintiff was taken by ambulance to Blodgett Memorial Medical Center.

Plaintiff's deposition testimony indicates that he remembers very little about the events which occurred at Forest View Hospital the morning of October 19, 1990. He remembers getting his hand caught in a door and yelling out for a woman named Nancy Elliott. He also knows that people were trying to run away from him. He does not, however, recall feeling any pain.

Although the plaintiff recalls little about the incident, he offers the deposition testimony of Chuck Thorndill to contradict the officers' account of the facts. Mr. Thorndill, an employee of Forest View, was stationed behind the double doors of the hallway during plaintiff's encounter with the officers. Occasionally, the double doors were opened and Mr. Thorndill was able to peer into the hallway and view the fracas. Mr. Thorndill testified:

Q: Did you see any deputy hit Mr. Nicholson in the head with a baton?

A: Yes.

Q: How many times did you see Mr. Nicholson get hit in the head with a baton?

A: I don't know.

Q: More than once?

A: Yeah, multiple.

Q: How many different officers did you see hit him in the head with a baton?

A: I don't know.

Q: More than one officer?

A: More than one, but I don't know how many.

### Legal Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56. The rule requires that the disputed facts be material. Material facts are facts which are defined by substantive law and are necessary to apply the law. A dispute over trivial facts which are not necessary in order to apply the substantive law does not prevent the granting of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The rule also requires the dispute to be genuine. A dispute is genuine if a reasonable jury could return judgment for the nonmoving party. *Id.* This standard requires the non-moving party to present more than a scintilla of evidence to defeat the motion. The summary judgment standard mirrors the standard for a directed verdict. The only difference between the two is procedural. Summary judgment is made based on documentary evidence before trial, and directed verdict is made based on evidence submitted at trial. 477 U.S. at 250–51, 106 S.Ct. at 2511.

A moving party who does not have the burden of proof at trial may properly support a motion for summary judgment by showing the court that there is no evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the motion is so supported, the party opposing the motion must then demonstrate with "concrete evidence" that there is a genuine issue of material fact for trial. *Id.; Frank v. D'Ambrosi*, 4 F.3d 1378, 1384 (6th Cir.1993). The court must draw all inferences in a light most favorable to the non-moving party, but the court may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

### Discussion

#### Excessive Force

Count I of plaintiff's amended complaint alleges a claim under 42 U.S.C. § 1983. To successfully state a claim pursuant to section 1983, a plaintiff must identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988). Plaintiff alleges that the officers' conduct in subduing him constituted an excessive use of force. Defendants contend they are entitled to qualified immunity on this claim.

The qualified immunity doctrine shields government officials performing discretionary functions from civil damages liability, provided "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The qualified immunity doctrine is based upon the policy that the public is better served if officials are free to act with independence and without fear of consequences when their duties require action in areas where clearly established rights are not implicated. *Meyers v. City of Cincinnati*, 979 F.2d 1154, 1156 (6th Cir.1992) citing *Harlow v. Fitzgerald*, 457 U.S. 800, 819, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396.

In *Malley v. Briggs*, 475 U.S. 335, 341 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986), the Court extended the rule articulated in *Harlow* and held that police officers are entitled to qualified immunity unless, "on an objective basis, it is obvious that no reasonably competent officer would have concluded that [the conduct was lawful]; but if officers of reasonable competence could disagree on this issue, immunity should be recognized."

When a defendant raises a qualified immunity argument in a motion for summary judgment, the plaintiff must satisfy a two prong test: "First, the allegations must state a claim of violation of clearly established law. Second, the plaintiff must present evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1043 (6th Cir.1992) (citations omitted).

The use of excessive force by police officers gives rise to a Section 1983 action. *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). The Supreme Court has held that excessive force claims must be analyzed under the Fourth Amendment's reasonableness standard rather than under the Due Process Clause of the Fourteenth Amendment. *Graham v. Connor*, 490 U.S. 386, 388, 109 S.Ct. 1865, 1867–68, 104 L.Ed.2d 443 (1989). Whether the force used by the officers to arrest plaintiff was excessive, and thus violative of "clearly established law," turns upon whether their actions were objectively reasonable under the circumstances. *Graham*, 490 U.S. at 397, 109 S.Ct. at 1872. The reasonableness inquiry in an excessive force action is an objective one which should disregard the underlying intent or motivation of the defendant. A court should consider the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396, 109 S.Ct. at 1872. The Sixth Circuit has held that the ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity. *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

Because qualified immunity is an immunity from suit rather than a mere defense to liability, the Sixth Circuit has stressed the importance of resolving immunity questions at the earliest possible stage of the litigation. *Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir.1993). What is clearly established law and whether the officers acted reasonably are to be decided before trial. *Id.*

The issue before this Court is not simply whether the police officers acted in a reasonable manner, but also whether the officers' conduct violated clearly established law, and whether an officer in a similar position would have known that the conduct was illegal. *Russo v. City of Cincinnati*, 953 F.2d 1036, 1045 (6th Cir.1992). Although the issue of qualified immunity is a legal one, the analysis in an "excessive force" claim is necessarily fact specific. Each case is, almost by definition, different from every other case. The nature of the alleged crime, the force used by the plaintiff, the threat to the officers' safety, the verbal interaction between the persons involved, the known criminal history of the subject, and the known mental condition of the subject will vary from one case to another. Yet the courts are asked to decide as a matter of law, if the officers' actions were "objectively reasonable" in a particular situation such as that presented in this case. This Court is not permitted to use 20/20 hindsight while sitting in its tranquil office, but must make "allowance for the fact that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving . . . ." *Graham*, 490 U.S. at 396–97, 109 S.Ct. at 1872.

Because these matters are fact specific, legal precedent provides only limited guidance. The following cases, however, are somewhat factually similar. In *Rhodes v. McDannel*, 945 F.2d 117 (6th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 872, 116 L.Ed.2d 777 (1992), police officers responded to a call by a woman who stated that James West was chasing her around the house with a machete. When the officers entered the house Mr. West advanced towards them and the woman with a machete. Although the officers ordered West to drop the knife, he failed to heed their warning. When Mr. West advanced within a distance of four to six feet with the machete raised, one of the officers fired his weapon and killed Mr. West. The representative of Mr. West's estate filed a Section 1983 action against the police officers and sheriff's department. Plaintiff ar-

gued that the officers used excessive force and created the need for such force. The trial court granted summary judgment for the defendant and held as a matter of law that the deadly force used was not unreasonable. The Sixth Circuit affirmed stating "[a]s West advanced upon the officers and [the woman] with a raised machete, despite several warnings to halt, [the officer] was justified in using deadly force." *Id.* at 120.

In *Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir.1992), Thomas Bubenhofer, a paranoid schizophrenic, was fatally shot by police officers. His estate brought suit under Section 1983 alleging that the officers' use of force was excessive and that the city had failed to adequately train its officers. Mr. Bubenhofer had been under the care of physicians at a psychiatric institute. When he failed to return to the institute after a two hour leave pass had expired, his family called the police for assistance in returning him to the institute. The officers who arrived at Mr. Bubenhofer's apartment building were told that he was alone in his apartment and did not have a gun. After trying unsuccessfully to convince Mr. Bubenhofer to open the door to his apartment, the officers forced the door open approximately four to six inches. Within moments, Mr. Bubenhofer opened the door and stood holding a knife in each hand with the blades pointed towards the officers. One of the officers fired a taser[4] dart into Mr. Bubenhofer, and he began to falter. The officer fired a second dart into Mr. Bubenhofer when the effect of the first taser had worn off. After overcoming the effect of the second taser, Mr. Bubenhofer rushed toward one of the officers with both knives. The other officers fired their revolvers at Mr. Bubenhofer several times. Mr. Bubenhofer fell to the bottom of the stairwell holding one knife. The officers stood on the landing above him. When Mr. Bubenhofer managed to get up, he was shot by a third and fourth taser. According to the officers, Mr. Bubenhofer charged up the steps with a knife in hand and they again fired their revolvers several times. Mr. Bubenhofer fell back down the steps but refused to drop his knife. When he allegedly stood up and began climb-

ing the stairs with the knife, he was shot again. He lay still and was taken to a hospital where he died. He had been shot a total of twenty-two times. The Sixth Circuit held that the initial use of the taser was deployed in an effort to obviate the need for lethal force and did not violate clearly established law. The court stated that the taser's subsequent use when Mr. Bubenhofer lay at the bottom of the stairwell and posed no immediate threat was a "closer" question. However, the court concluded that the defendants were entitled to qualified immunity as to this use of the taser as well because its use did not violate clearly established law. The Sixth Circuit held that the officers' repeated use of their revolvers created a factual issue as to whether the defendants violated clearly established law.

■ In the instant case, as in *Russo*, the officers who arrived at the scene were confronted with a mentally disturbed man who threatened them with physical harm. Unlike in *Russo*, the officers in this case were actually injured by the plaintiff. Although the plaintiff in this case was not armed, the record shows that he was a physically strong man who was suffering from a disorder which made him grossly agitated. Furthermore, it is undisputed that at one point during the confrontation Officer Droski's ASP baton was loose on the floor. I believe the facts in this case are more analogous to the taser darts used in *Russo* than to the gun shots. The officers in this case did not exercise force resulting in death, which was the sole area of potential liability in *Russo*.

This is not a case where the officers beat upon a helpless, prone person. Trying to reason with the plaintiff during this confrontation would have been, I think, fruitless. Even the psychiatric workers had evacuated the area or were hiding. Plaintiff was trying to enter other areas of the hospital. The officers noticed blood on the plaintiff and substantial destruction in the hallway. When the officers first spotted plaintiff, they ordered him to lie down. The plaintiff struck the officers before they struck him. Plaintiff

4. A "taser" is an electronic device used to subdue violent or aggressive individuals. By press-

ing a lever, a high voltage electrical current is transmitted through a wire to the target.

knocked officers to the ground. He punctured Officer Droski's eardrum and kicked at the fallen Officer as he lay on the ground. Even the testimony of Mr. Thorndill shows that the officers did not use their batons except when there was a confused hand-to-hand battle. In the absence of a melee, the officers tried less injurious tactics such as trying to tackle the plaintiff. It took eight officers to subdue the plaintiff.

This was a very unfortunate situation. However, the fact is that these officers were called to Forest View Hospital by the hospital's own frightened staff to prevent the plaintiff from doing further damage and to restore order. When the officers arrived at the hospital, they justifiably treated the situation as a police matter and not as a medical matter. Perhaps, in hindsight and with time for reflection and planning, everyone wishes things had been handled differently. But this Court cannot apply a hindsight standard. Thus, considering all of the circumstances of this particular case, I find that according to the undisputed facts, the officers did not violate clearly established law. Once the plaintiff started and continued the fight, the officers had no constitutional duty to retreat or to submit.

### Failure to Hire, Train and Supervise

 Count II alleges that the Kent County Sheriff's Department failed to properly hire, train and supervise its officers. A section 1983 claim against a municipality cannot be based on a theory of vicarious liability or the doctrine of respondeat superior. *Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). A municipality can only be liable if it had a policy or custom of failing to properly hire and train its officers or if it encouraged or permitted its officers to engage in the use of excessive force. *Id.* There must also be a direct causal link between the policy, custom, or deficient training and the alleged constitutional violation. *Montgomery v. County of Clinton,* 743 F.Supp. 1253, 1257 (W.D.Mich.1990), *aff'd without opinion,* 940 F.2d 661 (6th Cir.1991) (citing *Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 1205–06, 103 L.Ed.2d 412 (1989).

In this case, I have already determined that the officers' conduct did not violate the plaintiff's constitutional rights. Thus, a direct causal link between the allegedly deficient practice and a constitutional violation is missing. Summary judgment must be granted in favor of the Kent County Sheriff's Department.

### Conspiracy

 Count III of plaintiff's amended complaint alleges that the defendants conspired to deprive plaintiff of constitutionally protected rights. To establish a claim of conspiracy, plaintiff must show:

(1) A conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to either person or property or a deprivation of any right or privilege of a United States citizen.

*Volunteer Medical Clinic, Inc. v. Operation Rescue,* 948 F.2d 218, 223 (6th Cir.1991).

 In support of this claim, plaintiff offers evidence that after the incident the officers gathered privately in a room at Blodgett Hospital to talk about what happened. Plaintiff's brief states, "[o]bviously, the purpose of this meeting was to discuss what to report, and how to report it." This Court does not find the officers' alleged purpose for meeting to be quite so obvious. The officers were, in fact, present at Blodgett Hospital to receive treatment for injuries they sustained as a result of the incident. I find no factual support for the plaintiff's conspiracy claim and the defendants are entitled to summary judgment as to this count.

### Denial of Medical Care

Plaintiff alleges in Count V that he was denied medical care. I find this claim to be without factual support. After subduing the plaintiff, defendants had him transported by ambulance to Blodgett Memorial Medical Center. He was taken to Kalamazoo Regional Psychiatric Hospital later that same day. During oral argument plaintiff's attorney stated he would be willing to voluntarily dis-

miss this count. The Court has not received a motion to dismiss and will therefore grant the defendants' motion for summary judgment.

### Pendent Jurisdiction

Because this Court is granting the defendants' motion for summary judgment with respect to Counts I, II, III, and V which allege federal causes of action, plaintiff's pendent state law claim contained in Count IV will be dismissed without prejudice so that it may be asserted in state court.

### CONCLUSION

For the reasons stated above defendants' motion for summary judgment (docket entry # 78) is GRANTED and the plaintiff's Amended Complaint is DISMISSED.