NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0622n.06
Filed: October 16, 2008

Nos. 07-2360/07-2361

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

AMANDA LANDIS, Personal Representative
of the Estate of Charles Christopher
Keiser, Deceased.

On Appeal from the United
States District Court for the
Plaintiff-Appellee          Eastern District of Michigan

vs.

JASON BAKER, et al.

Defendants-Appellants.


BEFORE:     MOORE, COLE, Circuit Judges; and GRAHAM[*], District Judge.

GRAHAM, District Judge.  This civil rights and wrongful death action concerns whether the defendants, a Michigan State Trooper and three Livingston County Deputy Sheriffs, are entitled to qualified and/or governmental immunity arising from the death of a suspect during an attempted arrest.  Charles Keiser, deceased (Keiser) drowned when the individual defendants were attempting to arrest him while he was in approximately two feet of water, mud and sediment.

Plaintiff Amanda Landis, Keiser's daughter and personal representative, filed a

---

[*]     The Hon. James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

1

complaint for wrongful death against Michigan State Troopers Todd Cardoza (Cardoza)[1] and Greg Galarneau (Galarneau), Livingston County Deputy Sheriffs Jason Baker (Baker), James Lynch (Lynch), William Schuster (Schuster),[2] (collectively, defendant officers) and Livingston County. Plaintiff alleged a 42 U.S.C. §1983 claim for violation of Keiser's constitutional right to be free from unreasonable searches and seizures, claiming that the defendant officers used excessive force in arresting him. Plaintiff also alleged a section 1983 claim against Livingston County claiming it has a policy of violating constitutional rights by its conscious disregard of the substantial risk of harm posed by its failure to properly train, screen, investigate and discipline its employees. Count Three of the complaint alleged state claims of assault and battery. Plaintiff sought both compensatory and punitive damages.

Defendant Galarneau filed an answer, along with a motion to dismiss the section 1983 and assault and battery claims, on December 21, 2005. Livingston County, and Deputy Sheriffs Lynch, Baker, and Schuster filed an answer on January 6, 2006. The County, Deputy Sheriffs and Galarneau filed motions for summary judgment. The individual officers all claimed qualified and governmental immunity. After conducting a hearing on the motions, the district court denied the individual officers' motions on September 28, 2007.

---

[1] Trooper Cardoza died in an unrelated incident on March 25, 2005 and was dismissed from the case on October 17, 2007.

[2] Deputy Schuster was dismissed from the case on October 17, 2007.

The defendant officers argue on appeal that the district court erred in concluding that a reasonable jury could find that their actions against Keiser were objectively unreasonable. Defendants assert that the totality of the circumstances required a finding that the officers did not use excessive force against Keiser and that even if they did, they had no reason to know that their actions would violate a clearly established constitutional right.

## I. Background

In order to seek interlocutory review, the defendants must concede the plaintiff's view of the facts. Shehee v. Luttrel, 199 F 3d 295, 299 (6th Cir. 1999).

On the morning of November 25, 2004, several motorists called Livingston County 911 Central Dispatch to report that a bulldozer was blocking the two southbound lanes on US-23 near —59 in Hartland Township. Callers described a white male with long blond hair and a brown jacket running down the median in a southbound direction away from the bulldozer. Trooper Cardoza and Livingston County Sheriff Deputy Oswalt were dispatched to the scene at 8:37a.m. Trooper Cardoza arrived first, and, noticing the precarious position of the bulldozer which was perched near the crest of the hill, he asked Oswalt to shut down southbound US-23.

Cardoza continued down US-23 until he noticed a man matching the 911 callers' description trying to enter a large front and rear loader in the median of the highway, south of the bulldozer. After exiting his vehicle, Cardoza approached the man, Charles Keiser, a forty-seven year old resident of Oakland County, Michigan. When asked to stop by the

3

officer, Keiser "muttered something about God" and ran towards traffic heading northbound on US-23, eventually crossing the freeway toward a fence separating US-23 from Blaine Road. Because Keiser would not stop as ordered, Cardoza sprayed him in the face with pepper spray but Keiser managed to climb the fence and continued running away from Cardoza.

Another Michigan State Trooper, Greg Galarneau, who had been alerted to the situation, arrived on Blaine Road and saw Keiser walking southbound towards him. However, when Keiser looked up and noticed Galarneau, he began running back towards Trooper Cardoza, who by now had climbed the fence and was running down Blaine Road. Despite verbal commands to stop, Keiser continued running until Trooper Cardoza was able to tackle him to the ground. Galarneau then arrived and assisted Cardoza in trying to handcuff and restrain Keiser.

At some point, Keiser was able to roll over and grab Galarneau by the throat[3]. Noticing that Galarneau was having difficulty breathing, Cardoza retrieved Galarneau's baton and struck Keiser with it in the forearms and thighs. Galarneau then sprayed his pepper spray in Keiser's face which caused him to release his grip on Galarneau's throat.

---

[3] There is a factual question as to how this occurred. In his statement, Cardoza indicates that the officers and Keiser were positioned on an embankment and began sliding, which allowed Keiser the opportunity to free his hands. According to Cardoza, Keiser then began choking Galarneau with both hands for approximately 15 seconds. Detective Gregory Poulson reports in his incident report, that the officers were unable to control Keiser and he "threw them off of him." He further states that as Galarneau was holding Keiser's left arm, Keiser grabbed Galarneau's throat with his right hand and began choking him.

Keiser then stood up and walked into the nearby woods. At 8:48 a.m., Galarneau radioed in to dispatch to report that "this guy [Keiser]'s on something, man" and that "nothing can stop him at this point." Galarneau then requested back up from a county officer with a taser.[4]  Neither Galarneau nor Cardoza had been trained in the use of a taser, and they were not authorized to carry one.  After calling in for a taser and backup, Galarneau and Cardoza followed Keiser into the woods until Keiser stopped in a swampy area.  Keiser had not spoken to the officers and "gave no verbal resistance."  He was not armed when the officers approached him in the swamp.

At 8:51 a.m., Deputy Lynch who had been listening to the radio traffic, relayed to the dispatcher that he was in possession of a taser and would be heading out to meet the other units.  Deputy Baker was also alerted to the situation and arrived on the  scene prior to Lynch.  At this point, Trooper Galarneau was positioned approximately twenty feet to the east of Keiser, with Trooper Cardoza on the west side of Keiser.  As Baker approached the scene, he saw Keiser in a "water hole, just standing, not swaggering, not pacing, not doing anything, just standing."  Keiser had his hands in the water, as though he were searching for something, but in a very slow and methodical manner.  Baker referred to Keiser as "very

---

[4]  A "'taser' is an electronic device used to subdue violent or aggressive individuals. By pressing a lever, a high voltage electrical current is transmitted through a wire to the target." Nicholson v. Kent County Sheriff's Dept., 839 F. Supp. 508, 515, n.4 (W.D. Mich. 1993). The "advanced tasers" like the one used by Deputy Lynch not only "stun the target; they directly control the muscles, causing an uncontrollable contraction."  The taser can be used to either shoot 2 probes out at the target up to a range of 21 feet or in "stun gun" mode where the taser is directly placed on the body of the target. When the taser is used in "stun mode" the taser does not fully incapacitate the muscles but rather is used for "pain compliance."

5

lethargic, almost like 'Frankenstein.'" Baker tried to talk Keiser into giving himself up and coming out of the water. He asked Keiser "his name, where he was, what day it was, etc." but "Keiser had nothing but a blank stare on his face and looked right through [Baker]."

Shortly thereafter, Deputy Lynch, along with Deputy Schuster, arrived on scene and asked Keiser to take his hands out of his pockets at least three times. Keiser did not respond. Lynch noted that "Keiser was completely oblivious to his surroundings. . . there was no response verbally to anything that [Lynch] or Deputy Baker said." According to Lynch, during the entire time he was on the scene, Keiser "never said one word." At some point Keiser pulled a shiny metallic object out of his pocket and threw it to the side of the water. Deputy Baker mentioned that it could have been a knife. However, the officers agree that Keiser did not have any visible weapons on him.

The officers were now in positions approximately 20 feet to 20 yards away from Keiser, surrounding him on all sides. When Keiser again failed to respond to an order that he take his hands from his pockets, Trooper Galarneau then told Deputy Lynch to "tase him [Keiser]." Deputy Lynch gave a few more instructions to an unresponsive Keiser and thereafter fired two probes from the taser at Keiser from approximately 7 yards away.[5] One probe stuck in the exterior of Keiser's jacket while the other probe bounced off and fell to the ground. When the taser was deployed Keiser "flinched downward" and then pulled the probe off his coat and begin pulling at the wires. At this point, the officers attempted to

---

[5]    This is the farthest distance from which the taser should be shot. The taser manual states "never fire the advanced taser at a target more than 21 feet away" and the optimal range is 7-10 feet.

move in on Keiser, with Baker reaching Keiser first and grabbing him by both of the arms while Galarneau hit Keiser with a baton in the legs "approximately ten (10) times with no effect."[6] Deputy Lynch confirmed that there were "several" baton strikes to no effect. While Baker was still trying to maintain a hold on Keiser's arms, Keiser fell face forward, forcing himself and Baker into a "semi-prone" position in the water. Keiser had his face just above the water at that point with his hands underneath him holding his head and face out of the water. The depth of the water was later measured by police technicians at 10 3/4 inches and the depth of the water and sediment at 20 and ½ inches. Trooper Galarneau was "kneeling on the suspect's waist area" with Deputies Lynch and Baker on each side of Keiser. Trooper Cardoza and Deputy Schuster were observing the struggle from the side.

While Keiser was facing downwards towards the water in a push-up type position with his arms supporting the weight of his body, with Trooper Galarneau on Keiser's back holding one handcuffed arm, and Deputy Baker holding onto Keiser's other arm, Deputy Lynch moved in with the taser in "stun mode" and applied it directly to the back of Keiser's leg at the tibial nerve. When the trigger on the taser is pulled, a charge is emitted for approximately 5 seconds. Keiser had no obvious reaction to this stun. Fourteen seconds

---

[6] Trooper Galarneau offers a different version of events than both Lynch and Baker, who both testified that Baker made the first contact with Keiser by grabbing him at the wrists. In his deposition, Galarneau asserts that he made the first contact with Keiser when he struck him with a baton. He then states that Keiser turned and came at Galarneau and that at this point Galarneau grabbed Keiser and the other officers jumped in to help.

7

after the first stun, Lynch stunned Keiser a second time on the bare skin of his back. After the second stun, Keiser arched his back and groaned but failed to give his un-cuffed hand to the officers. Lynch then applied the taser to Keiser's brachial plexis region. Although Deputy Lynch states that he only shot the taser four times (once using the probe aimed at Keiser's chest and three times in stun mode), the taser records show that it was deployed against Keiser a total of five times in a span of one minute and thirty-seven seconds.[7]

Deputy Lynch then noticed that Keiser's face was under water up to his ear level. He informed the other officers that Keiser's face was underwater but the other officers were busy trying get Mr. Keiser's hands out from under him. Lynch then holstered his taser and attempted to pull Keiser's head out of the water by his hair. Deputy Baker also noticed that Keiser's face was, at one point, submerged to his hairline for approximately 10-15 seconds. Lynch stated that Keiser resisted having his head pulled out of the water and when he was unable to pull Keiser's head out of the water he released it. At this time, Keiser had only one arm underneath him for support, an officer on his back and another officer holding his other arm, and he was being stunned with the taser.

Eventually, the officers were able to handcuff Keiser's other arm and drag him out of the water onto dry land. Shortly thereafter, the officers noticed that Keiser was not breathing and that he had a "blue tint to his lips." The officers began chest compressions and breaths until an ambulance arrived. The EMS squad suctioned a "substantial amount"

---

[7] The State's autopsy report identified what appeared to be taser marks on the front of Keiser's thigh which may account for the fourth recorded activation of the taser.

8

of water, leaves, twigs and mud out of Keiser's airway. Keiser was pronounced dead upon arrival at the hospital. Two autopsy results, one conducted by the county, and one ordered privately by the plaintiff, reported finding thick mud in Keiser's airway and lungs, and concluded that he had died as a result of drowning.

## II. **The decision below**

On September 28, 2007, the district court denied summary judgment to Galarneau, Lynch and Baker and took the county's motion under advisement[8]. The district court concluded that there were issues of material fact with regards to qualified and governmental immunity. In reaching this decision, the court applied a three-step inquiry: 1) whether the facts viewed in a light most favorable to the plaintiff showed that a constitutional violation had occurred; 2) whether the violation involved a clearly established constitutional right of which a reasonable person would have known; and 3) whether plaintiff offered sufficient evidence to indicate that what the officer did was objectively unreasonable in light of clearly established constitutional rights. See Champion v. Outlook Nashville, Inc., 380 F. 3d 893, 900 (6th Cir. 2004).

The district court concluded that the evidence demonstrated that the officers had committed a constitutional violation by using excessive force in attempting to arrest Keiser. Construing the facts in favor of the plaintiff, the court noted evidence that Keiser was suspected of moving construction equipment to block traffic . The court also commented that although Keiser had actively resisted arrest previously, at the time the

---

[8] The county is not a party to the appeal.

9

force was used against him, "he was unarmed, knee deep in muddy water, surrounded by at least four law enforcement officers, and was no longer trying to resist arrest." In this position, he was then struck multiple times with a baton, shocked with a taser and pushed into a position that submerged his head in muddy water. The court concluded this conduct was objectively unreasonable and therefore constituted excessive force.

The district court next considered whether the defendant officers' actions violated a "clearly established constitutional right." In concluding that there was sufficient evidence upon which the court could answer the question in the affirmative, the court broke the officers' actions down into: 1) the use of the baton on Keiser, 2) the use of the taser on Keiser, and 3) the act of placing Keiser into a position such that his head became submerged in the muddy swamp. The court determined that the officers should have known that striking Keiser with a baton more times than was reasonably necessary to subdue him, or after he was already subdued, would constitute a violation of a constitutional right. The court reached the same conclusion about the use of tasers, drawing an analogy to cases in which the excessive use of pepper spray has been found to violate constitutional rights. The court further added that "common sense and analogy" mandated the conclusion that submerging a suspect's head under water would violate a clearly established constitutional right.

Finally, the district court considered whether the plaintiff had set forth sufficient evidence to indicate that the defendant officers' conduct was objectively unreasonable in light of the clearly established constitutional rights. Plaintiff offered the Autopsy

Report of Werner U. Spitz, MD and the statements of the officers to support her contention that the officers acted unreasonably in repeatedly striking Keiser with a baton. The autopsy report found "two parallel linear bruises approximately 3" in length, 3/8" apart with extensive underlying hemorrhage" on the front and back of Keiser's right thigh and concluded these were "baton marks." In an internal investigation report by the Livingston County Sheriff's Department, Deputy Baker reported that Galarneau struck Keiser at least ten times with the baton while Keiser was standing in knee deep water. These facts led the district court to conclude that there was a genuine issue of material fact with regards to whether the officers' conduct was objectively reasonable.

The autopsy report also indicated evidence of "paired taser injuries, total of 5 individual marks up to 1 1/4" apart with surrounding red halo" and "subcutaneous hemorrhage." Dr. Spitz' report also contained his opinion that the "use of taser while immersed would have enhanced the drowning process." A copy of the taser data log showed that the taser had been fired five times in a span of one minute and twenty three seconds. The district court concluded that this evidence suggested that Keiser was tasered five times in under two minutes, and possibly while his head was submerged in water. These facts led the court to conclude that the plaintiffs had established sufficient evidence to create a genuine issue of material fact with regards to whether the defendant officers' conduct was objectively reasonable.

Finally, the district court concluded that the evidence could support a finding that the officers' actions during the course of the attempted arrest forced Keiser's head

11

under water causing him to drown. These facts led the district court to conclude that there was a genuine issue of material fact with regards to whether the defendant officers were entitled to qualified immunity.

The district court also denied the defendants officers' motions for summary judgment based on Michigan's Governmental Tort Liability Act (GTLA). Under GTLA, governmental immunity applies to actions by a government official which are justified and are objectively reasonable, even if the actions are purportedly intentional torts. Van Vorous v. Burmeister, 262 Mich App. 467, 480; 687 NW2d 132, 141 (Mich. Ct. App. 2004). Because the analysis under GTLA also turns on whether the officers' actions were objectively reasonable, the court reiterated its finding that the evidence presented a genuine issue of material fact as to whether the officers' actions were objectively reasonable under the circumstances presented by this case.

### III. **Standard of review**

The issue of whether qualified immunity is applicable to an official's conduct is a question of law. See Champion, 380 F. 3d at 900 (6th Cir. 2004). If the legal question is dependent upon which version of facts one believes, then the jury must determine liability. Id. Thus, if there is a disagreement as to the facts, the reviewing court must consider the evidence in the light most favorable to the Plaintiff. Id. This court reviews such mixed questions of law and fact, as are found in a district court's denial of qualified immunity, de novo. Nelson v. Riddle, No. 06-5570, 217 Fed. Appx. 456, 460 (6th Cir. 2007). A defendant who is denied qualified immunity may file an interlocutory appeal if

12

the appeal raises pure legal issues. Shehee v. Lutrell, 199 F. 3d 295, 299 (6th Cir. 1999). A federal court of appeals hears an appeal of a denial of qualified immunity at summary judgment as an interlocutory appeal pursuant to the collateral-order doctrine under 28 U.S.C. § 1291. *Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008). Further, Michigan state law "authorizes an interlocutory appeal from an order denying governmental immunity from suit." Marvin v. City of Taylor, 509 F.3d 234, 251 (6th Cir. 2007).

## IV. <u>Discussion</u>

### A. **Whether the district court improperly denied the motions of defendant officers for summary judgment based on qualified immunity?**

Qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Champion, 380 F.3d at 900-901 (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The Sixth Circuit evaluates qualified immunity claims using the three-part inquiry employed below by the district court. See Feathers v. Aey, 319 F. 3d 843, 848 (6th Cir. 2003). First, this court must determine whether the plaintiff has alleged facts which, taken in a light most favorable to him, show that the official's conduct violated a constitutionally protected right. If the answer to the first question is "yes," then this court must determine whether the violated right was "clearly established such that a reasonable official, at the time the act was committed, would

13

have understood that his conduct violated that right." Id. Thirdly, if the right was clearly established, we must consider whether the plaintiff has alleged sufficient facts and supported his allegations with sufficient evidence to indicate that what the official did was unreasonable in light of the clearly established constitutional right. Id.

### 1.  Whether a constitutional right was violated.

The Supreme Court has established that the right to be free from excessive force during an arrest or investigatory stop is guaranteed by the Fourth Amendment's prohibition against unreasonable seizures. Graham v. Connor, 490 U.S. 386, 393-94 (1989).  Claims of excessive force in the context of arrests or investigatory stops are analyzed under the Fourth Amendment's "objective reasonableness standard," not under substantive due process principles. Id. Given that police officers often have to make split-second decisions under tense circumstances, "the reasonableness of an officer's belief as to the appropriate level of force should be judged from that on-scene perspective." Id. at 396.  In considering the merits of a constitutional excessive force claim, the court must pay " careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id.

Here, the facts, taken in a light most favorable to the plaintiff, establish that a

constitutional violation occurred.[9]  Construing the facts in the light most favorable to the plaintiff requires us to assume that the defendant officers used substantial force, including at least ten strikes of a police baton, to force Keiser face down into two feet of mud and water when he was not actively resisting arrest or posing a threat to anyone in the vicinity. This court must also assume that while Keiser was being pinned down by having Trooper Cardoza on his back, and while his arms were being held by two officers, Keiser was tasered four times in a span of several seconds.  The facts, taken in a light most favorable to the plaintiff, also require us to assume that Keiser's face was submerged for at least ten to fifteen seconds during the time the officers were holding him down. All of this must be examined against the backdrop of an initially minor and non-violent crime of moving pieces of construction equipment to block a freeway.

Although Keiser's second alleged crime, of attempting to choke Trooper Galarneau and/or evade the officers, was more severe and would constitute a felony under Michigan law, see, MCLS § 750.479 (a person shall not knowingly and willfully resist or obstruct and officer in the discharge of his duty), the evidence tends to show

---

[9] In making his argument on appeal, Trooper Galarneau does not accept the facts as asserted by plaintiff to be true. Rather, Galarneau asserts that he only struck Keiser with the baton once and that he did so because Keiser had turned towards him as if to attack.  Deputies Baker and Lynch, however, both reported that Galarneau struck Keiser multiple times with the baton. The difference between the plaintiff's version of events (that Galarneau struck Keiser at least ten times with his baton) and Galarneau's assertion that he struck once in response to an attack, is obvious and important. It may be objectively reasonable to strike an attacking suspect once while it might be objectively unreasonable to strike a non-violent, non-resisting suspect ten times. For purposes of an interlocutory appeal, the Court must view the facts in a light most favorable to the plaintiff and cannot consider Galarneau's factual arguments.

15

that at the time of the fatal struggle, Keiser was no longer a threat to the officers nor was he actively attempting to flee. See Frazell v. Flanigan, 102 F.3d 877, 885 (7th Cir. 1996) (the fact that a certain degree of force may have been justified earlier in the encounter to restrain the suspect does not mean that such force still was justified once the suspect had been restrained), overruled on other grounds by McNair v. Coffey, 279 F.3d 462 (7th Cir. 2002). After Keiser released Galarneau and walked into the woods, there was no longer a threat to any of the officers. Keiser was not belligerent or verbally resistant. He was not wielding a weapon. He was moving lethargically and appeared to be unaware of his surroundings. He was standing in at least a foot of muddy and cold water, surrounded by at least four officers who were aware that Keiser was behaving in a manner that could indicate a mental illness.

The district court correctly concluded that, when the facts are viewed in this light, the conduct of the officers was clearly unreasonable and a constitutional right was violated.

### 2. Clearly established right.

"Even if a plaintiff can establish the violation of a constitutional right by an officer, he must additionally establish that the right was clearly established at the time of violation in order to avoid dismissal on the grounds of immunity." Griffith v. Coburn, 473 F.3d 650, 658 (6th Cir. 20007). To satisfy this second prong, "the right must have been 'clearly established' in a particularized sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing

16

violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).  However, the official's exact action need not have been previously held to be unlawful but rather, "in light of pre-existing law the unlawfulness must be apparent." Champion, 380 F. 3d at 901 (citing Anderson, 483 U.S. at 640);  Hope v Pelzer, 536 U.S. 730, 741 (2002) (an official "can still be on notice that [his] conduct violates established law even in novel factual circumstances"); Harlow v. Fitzgerald, 457 U.S. 800, 820-21 (1982) (imposing liability "when a  public-official defendant 'knew or should have known' of the constitutionally violative effect of his actions").  Thus, in order to demonstrate that the officers violated a clearly established right, the plaintiff must show "the prior articulation of a prohibition against the type of excess force exerted here." Champion, 380 F. 3d at 902.  For purposes of determining whether a constitutional right is clearly established, the district court must first look to decisions of the Supreme Court, then decisions of Sixth Circuit and other courts within the circuit, and finally to decisions in other circuits. See Chappel v. Montgomery Fire Prot Dist. No 1,131 F.3d 564, 579 (6th Cir. 1997).

"The right to be free from excessive force is a clearly established right." Walton v. Southfield, 995 F.2d 1331, 1342 (6th Cir. 1993), overruled on other grounds by Saucier v. Katz, 533 U.S. 194 (2004).  Factors relevant to assessing disproportionate use of force include, but are not limited to, the need for the force, the degree of force applied, the injuries  inflicted, and totality of the circumstances surrounding the use of the force. Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973).  The trier of fact may infer from serious injuries sustained during an altercation with law enforcement that the type and

amount of forced used by police officers was unreasonable.  Estate of Escobedo v. City of Redwood City, No. C 03-3204 MJJ,  2005 U.S. Dist. LEXIS 23821 (N.D. Cal. Jan. 28, 2005).

The district court properly concluded that the officers violated a clear constitutional right when they 1) struck Keiser with a police baton more times than reasonably necessary, 2) shocked Keiser with a taser more times than necessary and in an unreasonably dangerous manner, and 3) pushed Keiser into a position in which his head was submerged in muddy water for a period of time.

### a.      Police baton.

The district court correctly concluded that the officers should have known that striking Keiser more times than was reasonably necessary would constitute a violation of a clearly established constitutional right. At the time that Keiser was being repeatedly struck with a baton, the officers should have known that the excessive use of a police baton can cause serious injury and may violate a constitutional right. McDowell v. Rogers, 863 F.2d 1302, 1307 (6th Cir. 1988) ("[A] totally gratuitous blow with a policeman's nightstick may cross the constitutional line").  Even where some degree of force is necessary, "gratuitous acts against a person who has been seized can violate the Fourth Amendment's reasonableness standard." Phelps v. Coy, 286 F.3d 295, 297, 301-02 (6th Cir. 2002); see also Shreve v. Jessamine County Fiscal Court, 453 F.3d 681, 688 (6th Cir. 2006)("cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest").

18

Plaintiff produced evidence that Keiser was struck ten times by Trooper Galarneau's baton while he was standing in the middle of a pool of at least ten inches of muddy water surrounded by at least four officers who apparently did nothing to stop Deputy Galarneau. In the Livingston County investigative report both Baker and Lynch report that Trooper Galarneau struck Keiser multiple times with his baton with enough force to make Deputy Lynch state that "he cringed with the thought of being hit." [10] The deposition testimony of the state medical examiner, Dr. Yung A. Chung, M.D., confirms that Keiser was struck with a baton. She testified that there were "patterned contusions" on the front and back of Keiser's right thigh, which in her medical opinion were consistent with two strikes to the thigh with a police baton. The district court did not err in concluding that the officers should have known that striking Keiser more than necessary would constitute a violation of a clearly established constitutional right.

The fact that Deputies Lynch and Baker did not participate in using the baton on Keiser during the standoff does not diminish their culpability. The district court did not discuss the fact that Lynch and Baker were not active participants in concluding that all the motions should be denied. However, the plaintiff has presented evidence that the deputies observed or had reason to know that excessive force would be or was being used, and had both the opportunity and the means to prevent the harm from occurring.

---

[10]   Defendants assert that this sentence meant that Lynch was afraid that he would actually get hit. Regardless, the statement is indicative of the violent nature of the baton strikes being imposed upon Keiser by Galarneau.

19

See Turner v. Scott, 119 F.3d 425, 429 (6th Cir. 1997).  Both officers were aware that the baton was being used repeatedly on Keiser. The officers were within feet of Keiser and Galarneau at the time of the beating, close enough that Galarneau was able to simply hand over his baton to Deputy Lynch when he had finished striking Keiser. See Skover v. Titchenell, 408 F. Supp. 2d 445, 451 (E.D. Mich. 2005) (question of fact remained where there was evidence the distance between the officer and the suspect being beaten was small and jury could conclude that the officer had the means to prevent the harm).

The district court did not err in concluding that the use of the baton on Keiser was a violation of a clearly established constitutional right.

### b. Taser

The district court correctly concluded that the officers should have known that the gratuitous or excessive use of a taser would violate a clearly established constitutional right. See Hickey v. Reeder, 12 F.3d 754, 757 (8th Cir. 1993) ("a stun gun inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless" and its use without a legitimate reason might violate the 8th amendment); Williams v. Franklin County, Ohio Sheriff's Dep't, 84 Ohio App. 3d 826, 619 N.E. 2d 23 (Ohio Ct. App. 1992) (genuine issue of material fact presented as to whether the use of stun gun twice on a woman who was surrounded by six officers and who may have been resisting was excessive).  Even without precise knowledge that the use of the taser would be a violation of a constitutional right, the officers should

20

have known based on analogous cases that their actions were unreasonable. See

Greene v. Barber, 310 F.3d 889, 898 (6th Cir. 2002) (holding that it may be excessive

force to use pepper spray on suspect who was resisting arrest but "not threatening

anyone's safety or attempting to evade arrest by flight"); Vaughn v. City of Lebanon, 18

Fed. Appx. 252, 266, (6th Cir. 2001) (holding that the use of a chemical spray may be

unconstitutional when there is no immediate threat to the safety of the officers or

others); Adams v. Metiva, 31 F.3d 375, 386 (6th Cir. 1994) (holding that the use of

mace on a compliant suspect is constitutionally unreasonable).

The evidence indicates that Lynch fired the taser probes at Keiser and that the

probes did not appear to attach to Keiser's body. Thereafter, Lynch altered the taser's

configuration so that it could be used in stun mode and then applied the taser directly

the Keiser's bare skin at least three times in a matter of seconds. Each stun lasts five

seconds and recovery time is "several minutes." During all the times that he was

tasered in stun mode, Keiser was in a "semi-prone push-up position" in at least 10

inches of muddy water with officers surrounding him, with one officer kneeling on his

back and, one arm in a handcuff. The taser manual warns against using the taser in

water, stating:

> The Advanced Taser causes temporary incapacitation. This can be dangerous
> and even fatal under specific circumstances. For example, someone tasered in a
> swimming pool could drown as they could not swim or support themselves.

The defendant officers should have known that the use of a taser in stun mode, in

rapid succession on a suspect who is surrounded by officers, in a prone position in a

21

muddy swamp, who has only one arm beneath him, and who has just been struck several times with a baton would be a violation of a constitutional right.

The fact that only Deputy Lynch pulled the trigger on the taser does not absolve Baker and Galarneau of liability. Bruner v. Dunaway, 684 F.2d 422, 426 (6th Cir. 1982) ("it is not necessary, in order to hold a police officer liable under [§] 1983, to demonstrate that the officer actively participated in [using force against] a plaintiff"). There is evidence that Trooper Galarneau, who requested backup from a patrol car with a taser, encouraged and agreed with the use of the taser employed against Keiser. Deputy Lynch testified that Trooper Galarneau yelled for Lynch to "tase" Keiser. Both Baker and Galarneau were holding onto Keiser in the water at the time that Lynch was deploying the taser, and saw Lynch do so. A reasonable jury could conclude that they had the means and opportunity to prevent the harm to Keiser.

### c. Kneeling on and tasering the suspect in several inches of water so that his head became submerged.

The defendant officers should have known that placing Keiser in a position so that his face would be submerged in muddy water would violate a clearly established constitutional right. It was more than foreseeable that in pinning Keiser face down in nearly one foot of water, with one officer on top of Keiser's back, and two others trying to grab his arms out from under him, his face would fall forward into the water. While in this position, Keiser was repeatedly stunned with the taser. The officers should have known that their actions would violate a clearly established constitutional right. This court has stated that "it is clearly established that putting exceptional pressure on a

22

suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated, constitutes excessive force." Champion, 380 F. 3d at 903. It should have been that much more obvious to the officers that applying pressure to keep a man in a face down position in nearly two feet of water and mud would constitute excessive force. Although the defendants argue that Keiser was still resisting arrest, his only act of resistance was to refuse to give his arms up to the officers, when his arms were apparently the only things holding his face out of the water. At the time of the fatal struggle, it was clear that forcefully tackling and pinning down a suspect who was unarmed would constitute excessive force. See Nelson v. Mattern, 844 F. Supp. 216, 222 (E.D. Pa. 1994) (finding that forcefully tackling a fleeing suspect who was unarmed constituted excessive force).

3. **Whether the plaintiff has set forth sufficient evidence to indicate that what the defendant officers did was objectively unreasonable in light of the clearly established constitutional rights.**

Once a civil rights plaintiff has presented sufficient evidence as to the first two components of the qualified immunity inquiry, the burden shifts to the law enforcement officer to demonstrate that "the evidence [will] not support a reasonable jury finding that [his] actions were objectively unreasonable." Estate of Kenneth Griffin v. Hickson, No. 98-3805, 2002 U.S. Dist. LEXIS 8567, *23 (E.D. Pa, May 9, 2002) (citing Groman v. Township of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995)). The defendants have failed to demonstrate that the evidence does not support a reasonable jury finding that they

23

acted unreasonably. This court has found that "[e]ven if a situation is 'tense, uncertain, and rapidly evolving,' that does not innoculate an officer from a charge that he crossed the line from subduing an individual to assaulting him." Lawler v. City of Taylor, 268 Fed. Appx. 384, 387 (6th Cir. 2008) (quoting Graham, 490 U.S. at 397). Here, a jury could reasonably conclude that it was objectively unreasonable to hold Keiser in a face down prone position in two feet of mud and water, after striking him ten times with a baton, and to apply a stun gun to Keiser four times while he was in this position, and after at least one hand was handcuffed. The Sixth Circuit has expressly concluded that "[c]reating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes objectively unreasonable excessive force." See Pirolozzi v. Stanbro, No. 07-CV-798, 2008 U.S. Dist. LEXIS 36054, *19 (N.D. Ohio May 1, 2008) (quoting Champion, 380 F.3d at 903).

A determination of the reasonableness of the defendant officers' conduct must take into account the fact that at the time of the fatal struggle, the defendant officers had reason to believe that Keiser was either on drugs or mentally unstable and they knew that he was unarmed. Deorle v. Rutherford, 272 F.3d 1272, 1282-83 (9th Cir. 2001) (the mental illness of a suspect is also a factor to be considered in determining the reasonableness of the force employed). Thus, the Defendant officers should have approached the situation with Keiser bearing this fact in mind. Id. (different tactics should be employed against an unarmed, emotionally distraught individual who is resisting arrest or creating disturbance than would be used against an armed and

24

dangerous criminal who has recently committed a serious offense); *Marsall v. City of Portland*, No. CV-01-1014-ST, 2004 U.S. Dist. LEXIS 8764, *33 (D. Or. May 7, 2004) ("when police are confronted by an unarmed, emotionally distraught individual who has committed no serious crime, as opposed to an armed and dangerous criminal, the governmental interest in using force is diminished, not strengthened, even when the suspect is irrational and inviting the use of force").

The Plaintiff has presented sufficient evidence to create a genuine issue of material fact with regard to whether the conduct of the defendant officers was objectively unreasonable.

> **B.    Whether the district court improperly denied defendants' motions for summary judgment on plaintiff's assault and battery claims based on governmental immunity.**

Governmental actions which would purportedly constitute intentional torts are protected by governmental immunity if those actions are justified. Conversely, if the actions are not justified, they are not protected by governmental immunity. Brewer v. Perrin, 132 Mich. App. 520, 349 N.W.2d 198, 202 (Mich. Ct. App. 1984). In order to support a claim for assault and battery, the amount of force used must have been unlawful because a police officer may use reasonable force when making an arrest. Id.; Smith v. Yono, 613 F. Supp. 50, 54 (E.D. Mich. 1974) (citing Brewer v. Perrin, 349 N.W.2d at 528) ("the measure of necessary force is that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary").  An  officer who uses excessive force may be held liable for

25

assault and battery. White v. City of Vassar, 157 Mich. App. 282, 293; 403 N.W.2d 124 (Mich. Ct. App. 1987).

In considering whether an officer is entitled to immunity under GTLA, the court must decide whether there is a genuine issue of material fact about whether the use of force was objectively reasonable. Murry v. Yuchasz, No. 268909, 2006 Mich App. LEXIS 3254 (Mich. Ct. App. May 11, 2007). This is the same analysis that the court employs in determining the 42 U.S.C. §1983 claim. Id. Because the analysis is identical to that used in the excessive force claim, the district court properly concluded that there was a genuine issue of material fact with regard to whether the officers' actions were objectively reasonable under the circumstances of this case.

## V. Conclusion

For the foregoing reasons the district court is affirmed.