**NOT RECOMMENDED FOR PUBLICATION**

File Name: 20a0219n.06

**Case No. 18-2296**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| RONALD GRAVES, | ) | |
| | ) | **FILED** |
| *Plaintiff-Appellant*, | ) | Apr 17, 2020 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| SHERIFF DALE MALONE, et al., | ) | |
| | ) | |
| *Defendants-Appellees*. | ) | O P I N I O N |

BEFORE:    COLE, Chief Judge; MERRITT and LARSEN, Circuit Judges.

COLE, Chief Judge.  On the day the events at issue occurred, Plaintiff Ronald "Ronnie" Graves was experiencing an episode of severe mental illness.  In a delusional state, he attacked his grandmother with a knife—a crime for which he was eventually found not guilty by reason of insanity.  After the assault, his grandmother flipped Graves into a bathtub and disarmed him, taking with her the blade of the knife he had used in the attack.  She then fled their trailer home and, from a neighbor's trailer, called 911.  Dispatch informed responding officers with the Monroe County Sheriff's Department that Graves was delusional, a suicide risk, and had threatened to kill himself with a knife on several previous occasions.

When deputies entered Graves's trailer, they found Graves sitting still in the bathtub, with his legs dangling over the side of the tub.  Graves's eyes were open, but he was completely non-responsive to the commands of the deputies.  Graves then raised his fist, which contained an

unknown small, dark object. One of the responding officers, purportedly perceiving a threat to himself, shot at Graves but missed. Another, purportedly perceiving a threat to his partner, shot at Graves twice with an AR-15. One of the bullets hit Graves in the face, leading to serious facial disfigurations. Several seconds later, a third officer tased Graves.

Graves brought a cause of action under 42 U.S.C. § 1983, alleging that defendants—Sergeant Gary Hedger, Deputy Kurt Potratz, and Deputy Charles Myers—used excessive force in violation of the Fourth Amendment. All three defendants moved for summary judgment, arguing that they were entitled to qualified immunity. The district court granted their motion and entered judgment in the defendants' favor. Graves now appeals. For the reasons that follow, we affirm the district court's determination that Sergeant Hedger is not liable in his supervisory capacity or for any failure to protect Graves from the harm that befell him, but we reverse the district court's determination as to the three officers' individual liability.

## I. BACKGROUND

### A. Factual Background

On July 16, 2015, Ronnie Graves had been suffering from severe hallucinations. Throughout the day, he had been plagued by voices in his head telling him, among other things, that he was going to be killed as part of a human sacrifice. His mental breakdown culminated in him using a knife to stab his grandmother in the mobile home in which they both lived. He has no memory of the attack.

Graves's grandmother had sustained non-fatal injuries in the confrontation, and she fled to her neighbors' trailer to seek help. She took with her the knife blade, which had separated from the handle during her struggle with Graves. The neighbors called 911 and reported the assault. Central dispatch reported to responding law enforcement with the Monroe County Sheriff's

Department that Graves had a history of suicidal threats involving knives but there was no incident history involving guns.

Defendants Hedger, Potratz, and Myers all responded to the scene, as did other first responders. Hedger was the first officer on the scene. He learned from neighbors that the knife blade used in the attack was secure and that Graves was still in the trailer. Hedger instructed another responding officer to acquire the blade and secure it in a patrol vehicle.

Potratz was the second officer on the scene. Immediately after he arrived, Potratz told Hedger he was going to grab his firearm—an AR-15—and Hedger ordered him to position himself with the weapon on the south side of Graves's trailer. Myers and Deputy Melissa Crain arrived next. Hedger, Myers, and Crain all positioned themselves at the north side of the trailer—Myers and Crain with handguns drawn, and Hedger with his taser drawn.

One of the officers yelled, "Ronnie, Sheriff's office." Hedger, Myers, and Crain then entered the north door of the trailer. As all three officers stood in the living room, they quickly ascertained that there was no one in the living room or the kitchen, but that the hallway to the bedrooms and bathroom was too crowded to safely enter.

Myers remained in the living room while the other officers regrouped outside the trailer. Hedger acquired a crowbar and, bringing Crain with him, pried open the south door where Potratz was stationed with his AR-15. As soon as the door was open, the three officers stationed at the south door—Hedger, Crain, and Potratz—could see Graves positioned in the bathtub across the hallway from the door. He was seated, facing out with his back to the wall, and his legs were dangling over the side of the tub. Graves was stationary, staring straight ahead, not making eye contact with anyone.

In the thirty-eight seconds that elapsed between locating Graves and shooting him, the following events transpired. As soon as he spotted Graves, Hedger shouted: "In the tub. In the tub. Right there. Don't f***ing move." Hedger and Crain entered the trailer through the south door, while Potratz remained just outside the door, his AR-15 trained on Graves. Hedger then ordered Myers—who had remained in the living room—to proceed down the cluttered hallway to the bathroom where Graves had been located. Myers proceeded down the hallway and made visual contact with Graves.

The officers could not see Graves's hands, so, over the course of approximately 30 seconds, they repeatedly shouted at Graves to show his hands. Graves did not respond to the commands; instead, he remained just as the officers found him, staring vacantly ahead. As Hedger surveyed the situation, he "wasn't worried about [Graves] escaping"—he was worried that Graves may try to provoke the officers to shoot him, or, as Hedger put it, he "was worried about a possible suicide by cop." (Hedger Dep., R. 30-3, PageID 566).

Myers testified that as he proceeded down the hallway, he saw a metal folding chair outside the bathroom door that impeded his ability to move, so he picked it up and moved it aside. As he moved the chair, Myers explained, his foot got caught in a divot in the hallway floorboard—or, he conceded, it was possible that he just tripped.

Meanwhile, as Myers fell, Graves continued to suffer from extreme delusions. He recalls that, as he sat in the bathtub, he felt safe from the voices in his head telling him that he and his family were going to die. But now that law enforcement had broken into his trailer, he heard voices "barking" at him, telling him that "they were finally there to finish [him] off." (Graves Dep., R. 30-24, Page ID 1736, 1741). It was then that he moved for the first time: he raised his

right fist straight up in the air. His fist contained a black plastic item. The record is not clear as to what the item was. Graves testified that he believed he was holding a comb.

Myers testified that, as he was falling in the hallway, he saw the item in Graves's hand, perceived it as a handgun, and feared for his life. He conceded, however, that he had no reason to believe that Graves had held a gun. Nevertheless, he decided then to shoot Graves. But his shot missed.

Potratz, for his part, offered several—sometimes contradictory—accounts of what he perceived the object to be. He declared to his fellow officers immediately after the incident that he believed the object was a gun. But in his deposition, his story changed: despite repeated questioning, he stated that he was unable to identify what he thought the object was at the time, other than that he perceived it to be "a weapon"—a rather unhelpful categorization, as it turns out, because Potratz also stated that in his view, "[a]nything can be a weapon." (Potratz Dep. R. 30-8 at PageID 1042.) He did cross some possibilities off the list stating that he did *not* perceive that Graves held a knife with a blade or—despite his earlier proclamation—a gun, and that he only later believed the object in Graves's hand to be the bladeless knife handle used earlier in the attack because someone told him that the handle had eventually been recovered from the bathtub.

As Myers shot his handgun at Graves, Potratz concurrently fired his AR-15 twice. Potratz testified that he didn't shoot because he heard Myers's gun go off; indeed, he was not sure who shot first as between him and Myers. He also could not specify whether he perceived that Graves was extending his hand when he shot, stating only that he "shot him when it was threatening." (R. 30-8 at PageID 1061.) Despite being unsure as to the order of events, or even as to what Graves was holding in his hand, he testified that he deployed deadly force under the belief that he was protecting Myers, because he perceived Graves could have harmed him. One of the two bullets

from Potratz's gun hit Graves directly in the face. After blasting through Graves's face, the bullet traveled through the trailer park and penetrated at least two other trailers.

In the immediate wake of the shootings, Hedger surveyed the gruesome scene. He knew that Graves had taken a bullet to the right side of his face: blood was everywhere and Graves's "face was hanging off" as Graves remained sitting still in the tub in the same position in which they had found him. (Hedger Dep. R. 30-3, PageID 574–75). Hedger also confirmed that Myers had not been shot. What happened next is disputed. Hedger claims he ordered Graves to raise his hands again. But Graves argues that statement is contradicted by the evidence: the dashcam recording suggests that no audible orders were given at all.

Seven seconds after shots were fired, Hedger tased Graves. He did so for a full five-second cycle. And he did so even though he conceded that Graves was non-responsive and might have been in shock—just as he speculated he himself would have been had he just been shot in the face with an AR-15.

After the incident, Graves was charged with Assault with Intent to Commit Murder for the attack on his grandmother. He was ultimately found not guilty by reason of insanity.

As a result of the shooting, Graves is completely blind in his right eye. His face is severely disfigured. He no longer has a right cheekbone and his sinus cavity is exposed through a void in his palate. His nose remains broken, and resultingly, his right nostril has caved in and will not permit air to flow to his lungs. He suffers from headaches and constant jaw pain.

### 2. Procedural History

On July 7, 2017, Graves filed a civil complaint seeking damages and injunctive relief under § 1983. Relevant here, he alleged that defendants Hedger, Myers, and Potratz unreasonably used excessive force against him in violation of the Fourth Amendment. Defendants sought summary

judgment, arguing that the uses of force were objectively reasonable, and that defendants were protected by qualified immunity. On October 10, 2018, the district court granted defendants' motion and entered judgment in favor of defendants. Graves filed a timely notice of appeal.

## II. ANALYSIS

A government actor is entitled to qualified immunity "when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). Thus, this court must make two determinations: first, whether the facts, viewed in the light most favorable to Graves, allege the deprivation of a constitutional right; and second, whether that right was clearly established such that a reasonable official would have known that his or her actions were unconstitutional. *Morgan v. Fairfield Cty.*, 903 F.3d 553, 560 (6th Cir. 2018) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Courts can address these two elements in any order." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236–37 (2009)). This court has explained that summary judgment in qualified immunity cases is improper when there are genuine disputes of material fact "as to whether [an] officer committed acts that would violate a clearly established right." *Scozzari v. Miedzianowski*, 454 F. App'x 455, 462 (6th Cir. 2012) (quoting *Vakilian v. Shaw*, 335 F.3d 509, 515 (6th Cir. 2003)). Summary judgment is also inappropriate where the reasonableness of an officer's action depends ondisputed facts. *Id.* (citing *Leonard v. Robinson,* 477 F.3d 347, 355 (6th Cir. 2007)).

Whether a right is clearly established depends on whether "an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). The Supreme Court has repeatedly emphasized that "the clearly established right must be defined with specificity" and not at a "'high level of generality.'" *City of Escondido v.*

*Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam)). The Court has also noted that this requirement is "particularly important in excessive force cases" because:

> [T]he Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue[.]

*Emmons*, 139 S. Ct. at 503 (quoting *Kisela*, 138 S. Ct. at 1152). Thus, while there need not be "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551 (internal quotation marks omitted)).

In evaluating whether a challenged act is reasonable "courts must account for 'the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Scozzari*, 454 F. App'x at 463 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). "Nevertheless, 'the fact that a situation unfolds relatively quickly does not, by itself, permit [officers] to use deadly force.'" *Id.* (quoting *Estate of Kirby v. Duva,* 530 F.3d 475, 483 (6th Cir.2008)).

Where, as here, multiple constitutional violations are alleged, this court analyzes each use of force separately. *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) ("The proper approach under Sixth Circuit precedent is to view excessive force claims in segments.") (citing *Gaddis v. Redford Twp.,* 364 F.3d 763, 772 (6th Cir.2004); *Dickerson v. McClellan,* 101 F.3d 1151, 1161 (6th Cir. 1996)). This segmented approach requires courts to

"first identify the 'seizure at issue' . . . and then examine 'whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances.'" *Id.* (quoting *Dickerson*, 101 F.3d at 1161).

Graves identifies three separate segments in which he argues unconstitutionally excessive force was used: First, the segment in which Hedger pried the door to the trailer open and either supervised the unconstitutional use of force and/or failed to protect Graves against the unconstitutional use of force; second, the segment in which Myers and Potratz fired their weapons at Graves; and third, the segment in which Hedger tased Graves. We address each below.

### 1. Claims Against Hedger for Supervising Unconstitutional Use of Force and Failing to Protect Against the Unconstitutional Use of Force

We begin with the first segment Graves identifies. When Hedger issued orders that led to a close-quarters confrontation, Graves argues, Hedger either supervised the unconstitutional use or force and/or failed to protect Graves from the unconstitutional use of force. There are separate tests for supervisory liability and liability for failure to protect: Supervisory liability, in the § 1983 context, requires "more than an attenuated connection between the injury and the supervisor's alleged wrongful conduct." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (citing *Phillips v. Roane Cty.*, 534 F.3d 531, 544 (6th Cir. 2008)). Instead, "supervisory liability requires some 'active unconstitutional behavior' on the part of the supervisor." *Id.* (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)). Put differently, the failure to supervise is only actionable if "the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Id.* at 242 (citing *Shehee v. Luttrell*, 199 F. 3d 295, 300 (6th Cir. 1999)). We have "interpreted this standard to mean that 'at a minimum,' the plaintiff must show that the defendant 'at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'" *Id.* (quoting *Shehee*, 199 F.3d at 300).

Liability for failure to protect, meanwhile, arises when "(1) the officer observed or had reason to know that excessive force would be or was being used; and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Goodwin v. City of Painesville*, 781 F.3d 314, 328 (6th Cir. 2015) (citing *Turner v. Scott,* 119 F.3d 425, 429 (6th Cir.1997)).

Graves maintains that Hedger is liable under both theories because he knew Graves was in severe emotional distress, yet nevertheless both ordered Myers and Potratz to enter the trailer with their weapons drawn and failed to prevent excessive force by coordinating with his fellow officers to minimize the risks. Graves also notes that Hedger's conduct violated Monroe County Sheriff's Office policy.

None of Graves's arguments are availing. In cases where we have found supervisory liability for excessive force, it has been where the government official ordered, or at least implicitly authorized, the use of force. *See, e.g.*, *Jones v. Sandusky Cty.*, 541 F. App'x 653, 667 (6th Cir. 2013)). Here, the record shows that Hedger ordered or authorized only the *circumstances* that, perhaps, ultimately led to the use of force; indeed, Myers and Potratz both testified that the decision to shoot was their own. Mere creation of the circumstances in which force is ultimately deployed does not give rise to a constitutional violation. *Livermore*, 476 F.3d at 406.

Graves's argument that Hedger should be subject to liability for failure to protect fails for similar reasons. "Generally speaking, a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997) (citing *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir. 1994)); *see also Baxter v. Bracey*, 751 F. App'x 869, 873 (6th Cir. 2018)). Nothing in the record establishes that Hedger had reason to know

that Myers and Potratz would discharge their weapons, and nothing in the record establishes that Hedger would have had the opportunity and means to prevent them from discharging their weapons. We therefore conclude that the district court properly granted judgment for Hedger on Graves's claims for supervisory liability and failure to protect.

### 2. Claims Against Myers and Potratz for the Use of Lethal Force

The next question is whether the district court erred in determining that Myers and Potratz are entitled to qualified immunity for their use of lethal force against Graves. We conclude that it did because the facts, taken in the light most favorable to Graves, show that the officers violated a clearly established constitutional right.

### a. Constitutional Violation

Where, as here, a plaintiff alleges a claim of excessive force in the context of an arrest of a free citizen, he or she invokes the protections of the Fourth Amendment to the United States Constitution. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures. . . ." U.S. Const. amend. IV. Thus, in ascertaining whether a particular use of force violates the Constitution, the operative question is whether the forced used was "reasonable" under the circumstances. *Graham*, 490 U.S. at 396. The reasonableness test under *Graham* is objective and asks "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (internal quotation marks omitted). *Graham* sets out a three-factor test to aid courts in assessing objective reasonableness. Those factors are: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 396, 397

(1989); *see also Tennessee v. Garner*, 471 U.S. 1, 11 (1985). When it comes to lethal force, we have emphasized that the "minimum requirement" of objective reasonableness is that the officer had "probable cause to believe that the suspect pose[d] a threat of severe physical harm, either to the officer or others." *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005).

The deputies insist that Graves posed an immediate threat to the safety of those on the scene. But the facts considered in the light most favorable to Graves tell a different story. It is true that the first *Graham* factor cuts against Graves—Graves was suspected of having committed a violent crime. But the scene the officers encountered when they pried open the trailer door was calm. They did not discover a man who was brandishing a knife at them; instead, they discovered a man who was—by all accounts—stationary and non-responsive. Additionally, Graves was incapacitated by position: he was seated, facing out with his back to the wall, and his legs were dangling over the side of the tub.

In the officers' telling, the lethal threat arose when Graves raised his hand with a black plastic object in it. Myers testified that he believed the object in Graves's hand was a gun. But a reasonable juror might decline to credit Myers's account for at least two reasons. First, she might find it non-credible because the object in Graves's hand was not a gun, bore little likeness to a gun, and because Myers himself testified that he had no reason to believe the object was a gun. Second, there is a genuine dispute of material fact as to the circumstances under which Myers perceived the purported threat. In Myers's telling, he moved a metal chair from the hallway, started falling, and *then* fired his weapon. In Graves's telling, Myers fired his weapon and then fell. The district court held this dispute was not material to the question of qualified immunity, as the "key fact in this case is that Plaintiff raised his arm holding a black object to scare the officers before they fired at him." (Order, R. 35, PageID 1824). But the question whether Myers acted reasonably when he

shot at Graves depends on what *Myers* perceived, and in Graves's telling, Myers had a clear line of sight to the object in Graves's hand and had not yet begun falling when he made the decision to use lethal force. Accepting those facts as true, a reasonable juror could conclude that it was unreasonable for Myers to perceive that Graves was holding a gun, and that it was therefore unreasonable for Myers to shoot Graves.

A reasonable juror might have even greater reason to be skeptical of Potratz's account due to its material inconsistencies. In the immediate aftermath of the shooting, Potratz claimed that he believed Graves held a gun. Later, during his deposition, he testified he did *not* perceive that Graves held a gun, nor did he perceive that Graves held a knife with a blade. (Potratz Dep., R. 30-8, PageID 1033 ("Q: My question is, did you see a knife with a blade, yes or no? A: No. Q: Did you see a firearm? A: No. Q: Did you think he had a gun? A: No.") Potratz believed, in retrospect, that Graves had been holding a knife—but he conceded that he only reason he believed that in hindsight was that someone told him that a knife handle had been found in the tub. (*Id.* at PageID 1044). Indeed, Potratz suggested that Graves could have been holding *any object at all* and he still would have fired his AR-15 at Graves: all he knew was that Graves held an object he perceived to be a weapon, but he also believed that any object could be a weapon. (*Id.* at PageID 1045 ("Q: Okay. You know as we sit here today that you shot an individual who didn't have a weapon in his hand and you shot him in the face; that's a fair statement, correct? A: No, because anything could be a weapon.").

In short, taking the facts in the light most favorable to Graves, the officers used lethal force against an unresponsive, slight, unarmed man who was trapped in his bathtub. His only movement was to raise his hand, which contained an object that—taking the facts in the light most favorable to Graves—the officers perceived as no more inherently dangerous than a permanent marker, or a

cell phone, or an action figure. Under the second *Graham* factor, we must then ask whether it was reasonable for the officers to conclude that on these facts, Graves posed an objective, immediate, and severe threat of physical harm. *See Untalan*, 430 F.3d at 315.

Our case law is clear: no reasonable officer would make such a conclusion. In *Sample v. Bailey*, we held that it was not reasonable to perceive a serious threat of physical harm from a suspect who was found in the same position as Graves: unarmed, silent, and constrained by position. 409 F.3d 689, 697 (6th Cir. 2005). True, in *Sample*, the suspect's hands were empty, *id.*, but that is a distinction without difference because, taking the facts in the light most favorable to Graves, the officers only perceived Graves to be holding an inert object. Notably, the *Sample* court reached this conclusion even though the officers were in the dark and unfamiliar building, and even though the suspect had hidden himself in a cabinet. *Id.* at 699. If it was unreasonable for officers to perceive a serious physical threat in *Sample*, it was even more unreasonable here, where officers observed Graves, unresponsive, in plain sight, over the course of 38 seconds. This ends the constitutional inquiry: because the officers did not have probable cause to believe that Graves posed an immediate threat of severe physical harm, the "minimum requirement" to justify the use of lethal force is not met. *Untalan*, 430 F.3d at 314.

Defendants cite a number of cases in service of the point that they had probable cause to believe that Graves posed an immediate threat of severe physical harm. But none have relevance here because every case involves a suspect who appeared to have a weapon and was capable of inflicting immediate harm on the officers. *See Lemmon v. City of Akron*, 768 F. App'x 410, 415 (6th Cir. 2019) (serious and immediate threat where suspect refused to listen to orders, told police they would have to shoot him, then reached for his waistband); *Pollard v. City of Columbus*, 780 F.3d 395, 403 (6th Cir. 2015) (serious and immediate threat where potentially armed suspect who

engaged in high-speed chase lost consciousness, suddenly regained it, then made gestures suggesting he had a weapon); *Untalan v. City of Lorain*, 430 F.3d 312, 315 (6th Cir. 2005) (serious and immediate threat where suspect "suddenly burst of the kitchen and lunged at" officers with a butcher knife). By contrast, this record contains no such undisputed evidence.

Although the unconstitutionality of the officers' actions is overdetermined because they did not meet the minimum requirement for the use of lethal force, it bears observation that the third factor, too, cuts against the reasonableness of Potratz's and Myers's actions. Graves was not resisting arrest. Graves, it is true, did not comply with officers' repeated commands to show his hands. But failure to comply with commands alone "does not indicate active resistance." *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013).

Thus, the totality of facts and circumstances—viewed in a light most favorable to Graves— compel the conclusion that the officers' use of lethal force was objectively unreasonable.

### b. Clearly Established

The next question is whether Myers and Potratz violated a clearly established right when they unconstitutionally fired at Graves. A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards,* 566 U.S. 658, 664 (2012) (internal quotation marks and alteration omitted). There need not be a case "directly on point for a right to be clearly established," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks omitted).

Here, the right of a criminal suspect "not to be shot unless he [is] perceived to pose a threat to pursuing officers or to others" has been established since at least 1988. *Robinson v. Bibb*, 840

F.2d 349 (6th Cir. 1988). We clarified the breadth of this right in 2005: "regardless of whether the incident took place at day or night, in a building or outside, whether the suspect is fleeing or found, armed or unarmed, intoxicated or sober, mentally unbalanced or sane, it is clearly established that a reasonable police officer may not shoot the suspect unless the suspect poses a perceived threat of serious physical harm to the officer or others. These factual distinctions between the cases do not alter the certainty about the law itself." *Sample*, 409 F.3d at 699.

In short: there is, perhaps, a version of events in which it was reasonable for Myers and Potratz to have shot at Graves. But where the question of qualified immunity depends on which version of events one accepts, it is the jury's province, not ours, to decide the truth. *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998). Taking the facts in the light most favorable to Graves, Myers and Potratz applied lethal force against a suspect from whom they perceived no serious physical threat. Those actions violate clearly established law.

3. **The District Court's Determination that Hedger is Entitled to Qualified Immunity for His Use of Non-Lethal Force**

The final question is whether the district court erred in determining that Hedger was entitled to qualified immunity for tasing Graves seven seconds after he was shot in the face.

a. **Clearly Established**

We have clearly established the straightforward proposition of law that it is objectively "unreasonable to tase a nonresisting suspect." *Eldridge v. City of Warren*, 533 F. App'x 529, 533 (6th Cir. 2013) (citing *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir.2012); *see also Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015) ("A simple dichotomy thus emerges: When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot."); *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495–96 (6th Cir. 2012) (collecting cases). The dissent

suggests that this principle is defined at too high a level of generality. But, as the Supreme Court has repeatedly explained, "general statements of the law are not inherently incapable of giving fair and clear warning to officers." *Kisela v. Hughes*, 138 S.Ct. 1148, 1153 (2018) (quoting *White v. Pauly*, 137 S.Ct. 548, 552 (2017); *see also United States v. Lanier*, 520 U.S. 259, 271 (1997), *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Here, our precedent provides a simple decisional rule: every reasonable law enforcement officer in our circuit knows that to deploy a taser against a non-resisting suspect is excessive. That the rule is straightforward makes it *more* capable of giving fair and clear warning to officers, not less.

It is also objectively unreasonable to use a taser against a suspect who previously resisted arrest but was, at the time the taser was deployed, incapacitated. *Landis v. Baker*, 297 F. App'x 453, 464 (6th Cir. 2008). The dissent identifies a limited exception to this rule where the uncontested facts establish that an officer deployed a taser against a suspect who was not resisting at the moment, but had been resisting immediately prior, and—but for the use of a taser—was expected to continue resisting in a manner that would have justified the later use of lethal force. *Russo v. City of Cincinnati*, 953 F.2d 1036, 1045 (6th Cir. 1992). Under such circumstances, we have concluded than an officer is entitled to qualified immunity because the actions "were intended to avoid having to resort to lethal force." *Id.* The record does not support the application of this exception here for at least two reasons because lethal force had already been applied against Graves—twice—at the time Hedger deployed his taser and it is a genuine dispute of material fact whether it was reasonable to perceive Graves as posing a continued threat.

### b.      Constitutional Violation

The question, then, is whether the facts viewed in a light most favorable to Graves establish that he was not resisting arrest. The district court correctly held that the disputed question whether

Hedger ordered Graves to show his hands was "not material to the legal analysis[.]" (Opinion, R. 35, PageID 1825–26). This is so because—even if Hedger *had* ordered Graves to show his hands—the failure to comply with that order does not constitute "active resistance" and therefore is not a sufficient basis upon which to justify use of a taser. *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013).

Where the district court faltered in its analysis was its conclusion that use of the taser was nevertheless reasonable because the threat from Graves, as a matter of law, had not been "clearly abated." (Opinion, R. 35, PageID 1825–26). In reaching this conclusion, the district court emphasized that when Hedger saw Myers fall, "he thought Myers had been shot and that Plaintiff had a gun." (*Id.*, PageID 1825). But it failed to note that, by the time Hedger tased Graves, Hedger had confirmed that Myers had *not*, in fact, been shot. And we cannot conclude, based on the record before us, that it was reasonable for Hedger to fire his taser at Graves because he was under the mistaken belief that Graves had fired his weapon at Myers but missed. The dissent emphasizes that Hedger heard Myers yell "Not hit. Not hit. Shots fired" (R. 30-15, PageID 1415), concluding that Myers's words "naturally give[] rise to the inference that someone had shot at Myers and missed." Not so: there is no record basis to conclude that Myers was not referring to the discharge of his *own* weapon. And—even setting aside the impropriety of drawing such inferences against Graves—it is undisputed that Hedger had seven seconds to survey the scene after the shots were fired and mentally process that Myers was unharmed and that Graves had been shot in the face and was nonresponsive, immobile, and not brandishing a gun. Hedger testified:

> Q: And you have no doubt in your mind at this point in time he took a bullet to the side, the right side of his face?
>
> A: Oh, that was clear.
>
> Q: Yeah, there is blood all over?
>
> A: His face was hanging off.

. . .

Q: So what do you do then?

A: I ordered to see his hands again.

Q: Okay. He was nonresponsive, right?

A: He hadn't been responsive the whole time.

(Hedger Dep., R. 30-3, PageID 575). Indeed, Hedger conceded that he would likely have been in shock had he sustained the injuries that Graves had just sustained. A reasonable jury could therefore conclude that, whatever threat Graves had ever arguably posed to the officers, it had abated during the seven-second span in which he was bloodied and nonresponsive. And if a jury so-concluded, the law of this circuit clearly would prohibit Hedger's use of a taser.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's order dismissing the claims against Sergeant Hedger for supervisory liability and for failure to protect against the use of force. We reverse the district court's order as to the individual liability claims against Sergeant Hedger, Deputy Myers, and Deputy Potratz, and remand to the district court for further proceedings consistent with this opinion.

LARSEN, Circuit Judge, concurring in part and dissenting in part. In qualified immunity cases, our ultimate inquiry is not whether the officers in question acted reasonably; it is instead whether existing law established "beyond debate" that they acted unreasonably. *City of Escondido v. Emmons*, 139 S. Ct. 500, 504 (2019) (per curiam) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 581 (2018)). And although we must construe the facts in the light most favorable to Graves, the objective reasonableness of the officers' actions is "a pure question of law" that is for the court to decide, not a jury. *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). Applying these principles, I agree with the majority that Hedger is entitled to qualified immunity for Graves' claims that he is liable for supervising an unconstitutional use of force and failure to protect.

I disagree, however, with the majority opinion's denial of qualified immunity to the three officers for their uses of force. Even under the version of the facts most favorable to Graves, it is clear that Myers and Potratz perceived that Graves was brandishing a dangerous weapon when he was only six to eight feet away from Myers. No existing precedent establishes that the use of lethal force under these circumstances is excessive; they are therefore entitled to qualified immunity. Hedger is also entitled to qualified immunity for his use of a taser. In his case, not only is there no controlling authority that "squarely governs the specific facts at issue," *Emmons*, 139 S. Ct. at 503, but binding circuit precedent affirmatively establishes that an officer who uses a taser—and even lethal force—in analogous circumstances is entitled to qualified immunity. I therefore join Part II.1 of the majority opinion and respectfully dissent from Parts II.2 and II.3.

I.

Qualified "immunity protects all but the plainly incompetent or those who knowingly violate the law." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)). It "attaches when an official's conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known." *Emmons*, 139 S. Ct. at 503 (quoting *Kisela*, 138 S. Ct. at 1152). "An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" *Kisela*, 138 S. Ct. at 1153 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014)).

Defining clearly established rights with specificity "is particularly important in excessive force cases," since "the result depends very much on the facts of each case." *Emmons*, 139 S. Ct. at 503 (quoting *Kisela*, 138 S. Ct. at 1153). "[G]eneral rules" cannot provide officers with sufficiently clear warning "outside an 'obvious case.'" *Kisela*, 138 S. Ct. at 1153 (quoting *White*, 137 S. Ct. at 552); *see also Wesby*, 138 S. Ct. at 590 (noting that such "obvious case[s]" are "rare"). Instead, "police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Emmons*, 139 S. Ct. at 503 (quoting *Kisela*, 138 S. Ct. at 1153). Existing precedent cannot squarely govern unless there is "controlling authority" or "a robust 'consensus of cases of persuasive authority'" addressing the question. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)); *accord Latits v. Phillips*, 878 F.3d 541, 552 (6th Cir. 2017).

Because this case arises on summary judgment, we must "construe all of the facts in the record 'in the light most favorable' to" Graves as the nonmoving party. *Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010) (quoting *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004)). "Once we have done so," however, "'the question whether [the officers'] actions were objectively unreasonable is a pure question of law'" that is for us, not a jury, to decide. *Id.* (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir.2009)). Moreover, because this is a matter of qualified immunity, our ultimate inquiry is not whether the officers' perceptions

and actions were reasonable but whether it is "beyond debate" that they were reasonable. *See Emmons*, 139 S. Ct. at 504 (quoting *Wesby*, 138 S. Ct. at 581).

II.

The majority does not claim that Myers and Potratz would have violated a clearly established right if they had reason to believe that Graves was holding a gun, knife, or other dangerous weapon when they fired at him. Nor could it—if the officers had reason to believe that Graves was holding a dangerous weapon, they are surely entitled to qualified immunity. The majority instead claims that, under the interpretation of the facts most favorable to Graves, all reasonable officers in Myers' and Potratz's position would have known that the object in Graves' hand was harmless. The record, however, just does not bear this conclusion out.

*Myers.* Seconds after the shooting took place, Myers told his fellow officers, "He had a gun whatever it was." Police Video Transcript, R. 30-15, PageID 1416. While Hedger was still searching Graves for the object that was in his hand, Myers reiterated, "It's a small handgun, right hand." *Id.* at PageID 1417. After Graves had been secured and Hedger confirmed that the object was a knife handle, Myers said, "Black is what I saw, black and coming right at me. . . . I could have swore it was just a little like a Derringer almost. What it came across as." *Id.* at PageID 1419–20. Myers reiterated that he had believed the object in Graves' hand was a gun at his deposition testimony. He testified, "From behind his back [Graves] came at me with a—what I perceived as a handgun, it was black handled with silver glint to the front of it." Myers Dep., R. 30-10, PageID 1258; *accord id.* at PageID 1261 ("He took his right hand from behind his back and raised a black handled metal object with metal towards the front of it at me as if he was pointing a pistol directly at my head. . . . I believed it was a gun, yes, sir. . . . I believed it was a gun, sir.").

The majority offers three reasons why a jury might not credit Myers' statements: "the object in Graves's hand was not a gun," the object "bore little likeness to a gun," and "Myers himself testified that he had no reason to believe the object was a gun." Maj. Op. at 12. None of these reasons withstands scrutiny.

The majority's third claim is plainly not true. Myers testified that he believed the object in Graves' hand was a gun and explained his reason for this belief: it looked like a gun in that it appeared to be "a black handled metal object with metal towards the front of it." The majority relies on an earlier statement in Myers' deposition where Graves' attorney asked Myers, "And you had no reason to believe he had a gun?" Myers responded, "I had no knowledge that he had one, that's correct." Myers Dep., R. 30-10, PageID 1257. Myers made this statement in the context of a series of questions about his intent in approaching the bathroom and moving a chair that obstructed his path in the hallway. Myers had not yet discussed the object in Graves' hand or what he perceived it to be. Instead Myers was testifying that at the time he approached the bathroom, *but before he saw the object in Graves' hand*, he had no reason to believe Graves had a gun:

> Q.   And it was your intent to talk him out?
> A.   That is correct.
> Q.   Negotiate him out of there?
> A.   Yes, sir.
> Q.   And I take it to be safe—you were concerned he might have a weapon?
> A.   Yes, sir.
> Q.   You had heard about a knife?
> A.   Yes, sir.
> Q.   So you were concerned he might have a knife?
> A.   I was concerned he might have a weapon, yes, sir.
> Q.   Okay. You hadn't heard anything about guns?
> A.   That's correct.
> Q.   Okay. And you had no reason to believe he had a gun?

- 23 -

> A.    I had no knowledge that he had one.  That's correct.
>
> . . .
>
> Q.    And you fall. . . . And then as you fell what happened next?
>
> A.    From behind his back he came at me with a—what I perceived as a handgun, it was black handled with silver glint to the front of it.

*Id.* at PageID 1256–58.  Myers therefore never contradicted his own statements that he believed Graves was holding a gun.

That the object in Graves' hand was not in fact a gun cannot on its own be a sufficient basis for a jury to conclude that Myers did not believe Graves had a gun or for the court to conclude that Myers was clearly unreasonable for believing Graves had a gun.  If that were so, we would have to deny qualified immunity in every case in which police officers used lethal force against a suspect who turned out to be unarmed.  That would be contrary to our caselaw.  *See, e.g.*, *Mullins v. Cyranek*, 805 F.3d 760, 768–69 (6th Cir. 2015); *Pollard v. City of Columbus*, 780 F.3d 395, 403 (6th Cir. 2015).  Instead, Myers is entitled to qualified immunity if it is at least debatable that he "had probable cause to believe [Graves] posed a serious threat."  *Pollard*, 780 F.3d at 403.

That leaves the majority's contention that the object in Graves' hand "bore little likeness to a gun."  What object does the majority have in mind when it makes this claim?  Does it mean the bladeless handle of the knife Graves used to stab his grandmother or the comb Graves claimed to be holding?  Although the majority is not explicit, the factual record and proceedings below make clear that the object can only be the knife handle.  Graves admitted before the district court that the object in his hand was "the black plastic broken handle of the knife whose blade his grandmother had broken off."  Response to Motion for Summary Judgment, R. 30, PageID 454.  He expressly stated that this point was "not disputed."  *Id.*

Despite this concession, the majority nevertheless finds that the "record is not clear as to what the item was."  Maj. Op. at 5.  But even if we were to overlook Graves' express concession

of this point, no *genuine* dispute of fact exists. Although Graves believed that he was holding a comb, it is undisputed that he was hallucinating at the time, and as Graves' counsel admitted at oral argument, the only object found in the bathtub was the knife handle. Since Graves' testimony "is blatantly contradicted by the record, so that no reasonable jury could believe it," we "should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

A photograph of the knife handle is in the record. R. 30-25, PageID 1785. The photo reveals that the knife handle is black with metal rivets of a silver color along the side. *Id.* The physical evidence thus provides no basis for a reasonable jury to disbelieve Myers' testimony that he saw Graves lift up a black-handled object with a silver glint and that he inferred from this perception that the object was a gun. *See Chappell*, 585 F.3d at 910 (accepting as true at the summary judgment stage officers' testimony as to their perceptions and subjective beliefs because the testimony was not "refuted by physical or circumstantial evidence" or "disputed by contrary testimony").

Whether it was reasonable for Myers to make this inference is of course a "pure question of law," not a jury question. *Scott*, 550 U.S. at 381 n.8; *Schreiber*, 596 F.3d at 332. The majority concludes that it is beyond debate that Myers' inference was unreasonable because the object in Graves' hand bore little resemblance to a gun and because, on the view of the facts most favorable to Graves, Myers was standing upright from six to eight feet away with "a clear line of sight to the object" when he fired. Maj. Op. at 13. I do not see how the majority can arrive at this conclusion. Even if he were standing upright with a clear line of sight, Myers still had only a fraction of a second to determine whether the black object with a silver metallic glint that Graves had suddenly lifted into the air was a gun. A bladeless knife handle is an unusual object; it is not the sort of

thing that can easily be recognized in an instant when it suddenly and unexpectedly comes into view. And if the knife handle had actually been a gun, an extra moment's hesitation could have been lethal. I am certainly not in a position to say that Myers' inference in the heat of the moment was unreasonable, let alone that every reasonable officer in Myers' position would have known the object was not a gun. But that is the standard the law requires to deny Myers qualified immunity. *Wesby*, 138 S. Ct. at 590.

Our precedents have repeatedly warned that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." *Boyd v. Baeppler*, 215 F.3d 594, 602 (6th Cir. 2000) (quoting *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992)). We must not substitute our "own personal notions—about what might have been, could have been, or should have been—in a 'sanitized world of . . . imagination' quite unlike the dangerous and complex world where [Myers was] required to make an instantaneous decision." *Chappell*, 585 F.3d at 912 (first alteration in original) (quoting *Boyd*, 215 F.3d at 602). "Rather, we must adopt a 'built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case.'" *Mullins*, 805 F.3d at 766 (quoting *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002)). If the majority's conclusion that it was clearly unreasonable for Myers to believe that Graves had a gun because he should have been able to see better is not an improper substitution of hindsight for an officer's on-the-spot judgment, what is?

The majority identifies no case where we have held, on similar facts, that an officer's belief that a suspect was holding a gun was unreasonable. This is no surprise, because we have never

expected officers to adhere to such an exacting standard for distinguishing guns from objects that merely look like guns within a fraction of a second. Instead, we have held, for instance, that officers had probable cause to believe that a suspect was holding a gun when he merely "clasped his hands in a shooting posture." *Pollard*, 780 F.3d at 400. If an officer on the scene can have probable cause to perceive a threat when a suspect's bare hands are clasped together as if they were a gun, he surely has probable cause when a suspect suddenly pulls out a black-handled object with a silver metal glint. Accordingly, even construing the facts in the light most favorable to Graves, it is "at least arguable," *Reichle v. Howards*, 566 U.S. 658, 669 (2012), that an officer in Myers' position would have reason to believe that Graves posed an imminent threat to his life and safety. I would therefore hold that he is entitled to qualified immunity.

*Potratz.* In the immediate aftermath of the shooting, Potratz told the other officers that he believed Graves was holding a gun. Police Video Transcript, R. 30-15, PageID 1416, 1419. He also said to Myers, "I—he was coming right at you, I had to shoot him. He was coming right at you." *Id.* at PageID 1420. At his deposition, however, Potratz testified that at the moment he fired his weapon he did not "think [Graves] had a gun." Potratz Dep., R. 30-8, PageID 1033. Instead, he stated that "[a]t the time with the item that he was coming up with, it appeared to be a knife to me." *Id.* In response to follow-up questions, he repeated that he believed the object in Graves' hand to be "a weapon" without specifying further. *Id.* at PageID 1039. Potratz further testified that he shot Graves because "I thought he was going to injure my partner [Myers]." *Id.* at PageID 1038.

Potratz clearly contradicted himself on the point of whether he believed Graves was holding a gun; thus, a reasonable jury could certainly conclude that Potratz did not believe that Graves had a gun. Potratz nevertheless consistently stated that he believed Graves was holding a

weapon of some kind that posed a threat to Myers and that he fired at Graves to protect Myers. There is no basis in the record for a jury to conclude that Potratz could see that the object in Graves' hand was harmless, and it would be pure speculation to conclude that Potratz knew that Graves was holding a bladeless knife handle. Construing the facts in the light most favorable to Graves, we must assume that Potratz either believed the object in Graves' hand was only a knife or believed the object was a weapon of some kind without having a good sense of what exactly the object was, and we must assume that Potratz believed that, whatever weapon he had, Graves posed a serious threat to Myers' safety.

The majority concludes that a jury could find that Potratz did not believe that Graves had anything genuinely dangerous in his hand. This is so, according to the majority, for two reasons. First, the majority claims, Potratz admitted that at the moment he fired his gun he did not believe the object in Graves' hand was a knife. Indeed, he only believed the object to have been a knife in hindsight, because someone had told him about the knife handle found in the tub after the fact. Second, the majority believes Potratz suggested in his deposition that he would have shot Graves even if Graves had "been holding *any object at all*." Maj. Op. at 13. As was the case with Myers, these findings stem from a misreading of Potratz's deposition testimony. For its first point, the majority relies on a portion of the deposition where Potratz was asked, "My question is did you see a knife with a blade, yes or no?" Potratz responded, "No." Potratz Dep., R. 30-8, PageID 1033. The majority overlooks, however, that in context Potratz was testifying that even though he perceived the object in Graves' hand to be a knife, the object was not in fact a knife:

> Q.     Okay. Did you see a knife?
> A.     Yes.
> Q.     Did you see a blade of a knife—strike that. Did you see a knife with a
>        blade?

> A.    At the time with the item that he was coming up with, it appeared to be a knife to me.
>
> Q.    I didn't ask what you what it appeared at the time. Did you see a knife?
>
> MR. FIELD [Potratz's attorney]:    He just testified to what he saw.
>
> MR. PALMER [Graves' attorney]:    He testified to what he saw but he didn't answer my question.
>
> BY MR. PALMER:
>
> Q.    My question is did you see a knife with a blade, yes or no?
>
> A.    No.

*Id.* Similarly, Potratz never testified that he only believed the object in Graves' hand was a knife after the fact. In the above-quoted passage, he testified that he believed the object was a knife at the time he fired. He was later asked why he had come to believe, by the time of his deposition, that the object was a bladeless knife *handle*. Potratz responded that he was told after the fact:

> Q.    Okay. And the only reason you believe it's a knife handle was because someone told you they found these knife handles around, correct?
>
> A.    Sitting here today?
>
> Q.    Yeah.
>
> A.    Fair to say.

*Id.* at PageID 1044. There is therefore no basis in the record for concluding that Potratz could see that the object in Graves' hand was not a knife at the moment that he fired.

As to the majority's second point, Potratz testified that he did not think it was fair to say that he had shot an unarmed man. *See id.* at 1045 ("Q. Okay. You know as we sit here today that you shot an individual who didn't have a weapon in his hand and you shot him in the face; that's a fair statement, correct? A. No, because anything could be a weapon."). But Potratz never claims that he would have still shot Graves if he had known that the object was just the bladeless handle of a knife, let alone "*any object at all.*" The majority's conclusion only follows if we can attribute to Potratz the premise that it is always acceptable to shoot a suspect who has any weapon, but Potratz never made a statement of that sort. In any event, our inquiry is not whether Potratz would

have acted unreasonably if he had perceived something different, but whether he in fact acted unreasonably in light of what he actually perceived.

We have never held that an officer must identify the kind of weapon a suspect is brandishing with specificity before he can have probable cause to conclude that the suspect poses an immediate, serious threat to others. Instead we look to "the totality of the circumstances" to see whether an officer's use of force was reasonable—or at least debatably reasonable. *Reich v. City of Elizabethtown*, 945 F.3d 968, 978 (6th Cir. 2019). It is undisputed that Graves had stabbed his grandmother in the head not forty minutes prior and that Potratz could not see Graves' hands until he suddenly lifted the knife handle into the air. It is also undisputed, although the majority makes no mention of it, that Graves brandished the knife handle in a threatening manner. Graves himself testified that he lifted up the knife handle (which he believed to be a comb) in order "to scare" the officers. Graves Dep., R. 30-24, PageID 1743. Graves also agreed that he "point[ed] the comb at them like it was a knife." *Id.* at PageID 1754. Myers was only six to eight feet away from Graves. Under these circumstances, it was at least arguably reasonable for Potratz to conclude that Graves was brandishing a dangerous weapon that he could use to strike and harm Myers, even if he could not identify with precision what kind of weapon Graves appeared to be holding.

As with Myers, the majority identifies no case where we have similarly second-guessed the reasonableness of an officer's belief that a suspect was brandishing a dangerous weapon. Although the majority relies on *Sample v. Bailey*, that case is inapposite because there the plaintiff's "hands were visible and empty." 409 F.3d 689, 697 (6th Cir. 2005). The plaintiff in *Bailey* never brandished any object in an effort to scare off the officers who eventually shot him. *Id.*

Because it is at least debatable that Potratz had reason to believe Graves was brandishing a dangerous weapon, he is entitled to qualified immunity. Myers was only six to eight feet away from Graves at the moment Graves sought to scare the officers off by lifting up the knife handle. Even though Graves would have had to get up out of the bathtub to reach Myers, it would not violate clearly established law for Potratz to conclude that Graves posed an imminent threat to Myers' safety. "There is no rule that officers must wait until a suspect is literally within striking range, risking their own and others' lives, before resorting to deadly force." *Reich*, 945 F.3d at 982. We have upheld qualified immunity for officers who used lethal force against knife-wielding suspects who were either much farther away or impeded by a more significant obstacle. *See id.* at 981 (suspect twenty-five to thirty-six feet away); *Stevens-Rucker v. City of Columbus*, 739 F. App'x 834, 837, 841–42 (6th Cir. 2018) (suspect six to eight feet away with a fence between the officer and the suspect). Accordingly, I would hold that Potratz is entitled to qualified immunity as well.

III.

Hedger's use of a taser is not a close question. The majority fails to appreciate the level of danger that a reasonable officer in Hedger's position could have perceived. It then defines the clearly established rights at issue too abstractly and improperly applies 20/20 hindsight to Hedger's decisionmaking. This leads to an outcome contrary to binding circuit precedent.

Hedger could not see Graves at the moment of the shooting or in the few seconds immediately preceding it because he was standing in the hallway two feet behind Myers. He saw Myers fall and initially believed that Myers had been shot. Myers then shouted, "Not hit. Not hit. Shots fired." Police Video Transcript, R. 30-15, PageID 1415. As the majority notes, Myers' statement that he was "not hit" made clear that he had not been harmed, but as Graves' counsel

admitted at oral argument, the statement naturally gives rise to the inference that someone had shot at Myers and missed. Thus, although he knew that Myers was unharmed, Hedger still had reason to believe that Graves had a gun and had fired it. Considering the *Graham* factors, Hedger reasonably could have believed that Graves (1) had attempted homicide, (2) posed an imminent threat to the lives of the officers under Hedger's command, and (3) was resisting arrest with lethal force. *See* 490 U.S. at 396. Use of a taser would undoubtedly be proportionate under these circumstances.

The majority asserts that we ought not to take into account the inference Hedger could naturally make from Myers' statement that he was not hit because "there is no record basis to conclude that Myers was not referring to the discharge of his *own* weapon." Maj. Op. at 18. But what Myers subjectively sought to communicate is irrelevant to our inquiry. The question we must answer is whether it would be reasonable for an officer in Hedger's position to infer that Graves had shot at Myers. Again, "[t]he reasonableness of officer conduct in excessive-force cases is a question for the court," *McKenna v. Edgell*, 617 F.3d 432, 441 (6th Cir. 2010), that in the qualified-immunity context requires us to defer to the officer's decision unless it is beyond debate that the decision was unreasonable. It is not a question for the jury that we must construe in the light most favorable to Graves.

Once Hedger turned into the bathroom and saw that Graves' face had been injured, the question becomes whether it is beyond debate that any reasonable officer in Hedger's position would have realized that his initial belief that Graves had a gun was mistaken or that any threat from Graves had abated. Hedger knew Graves had been shot when he saw him, but this fact does not negate probable cause to believe Graves had a gun. There were multiple gunshots, and it is entirely plausible that if Graves had fired, Potratz, who was covering Graves with a rifle, would

fire in return. Moreover, Myers' statement—"Not hit. Not hit. Shots fired."—which Hedger had just a few seconds to process, reasonably implied that Myers had been the target. According to Hedger's testimony, he could not see Graves' hands and was not able to confirm that there was no gun until he got very close to the bathtub, *after* tasering Graves. A reasonable officer in his position could therefore still believe that Graves had a gun, and was capable of firing it, even after seeing his maimed face. Even if some reasonable officers in Hedger's situation might have believed otherwise, officers "will not be liable for mere mistakes in judgment." *Butz v. Economou*, 438 U.S. 478, 507 (1978).

It is not clear that a suspect who possesses a firearm poses no threat just because he has been seriously wounded. And, in any event, our precedent has granted qualified immunity to an officer who used a taser in similar circumstances. In *Russo v. City of Cincinnati*, officers shot a suspect who had come toward them with a knife several times. 953 F.2d 1036, 1040 (6th Cir. 1992). The suspect fell down six or seven steps, *id.*, and then an officer tasered him "while he lay at the bottom of the stairwell," *id.* at 1045. We held that the officer was entitled to qualified immunity even though "at this point [the suspect] posed no immediate threat to the officers." *Id.* Just a few seconds earlier, the suspect had posed an imminent threat to the safety of the officers, and the officer's use of his taser was "intended to avoid having to resort to lethal force." *Id.* Hedger likewise used his taser with the intention of subduing Graves without the use of lethal force. Hedger is, if anything, more clearly entitled to qualified immunity than the officer in *Russo*. The suspect in *Russo* was clearly armed only with a knife, whereas Hedger had reason to believe Graves was armed with a gun. And Hedger only tasered Graves once, but the officer in *Russo* tasered the suspect multiple times. *Id.* Hedger is therefore entitled to qualified immunity under *Russo*.

*Russo* holds that an officer is entitled to qualified immunity when he uses nonlethal force in an effort to deescalate a situation where seconds prior he reasonably believed a suspect posed a lethal threat, even if, in hindsight, the suspect no longer posed a threat. The majority reads *Russo* to apply only where "but for the use of a taser," a suspect would be "expected to continue resisting in a manner that would have justified the later use of lethal force." Maj. Op. at 17. But the majority fails to identify any respect in which the officer in *Russo* had more reason to believe that there was a continuing threat than Hedger did. The majority identifies one fact that supposedly distinguishes the present case from *Russo*—"lethal force had already been applied against Graves—twice—at the time Hedger deployed his taser." *Id.* But this is also true of *Russo*; at the moment he was tasered, the suspect in *Russo* had already been shot "several times" and had fallen down a flight of stairs. 953 F.2d at 1040. Even as the majority reads the case, *Russo* establishes that Hedger is entitled to qualified immunity.

Furthermore, we have held that officers who used even *lethal* force under similar circumstances were entitled to qualified immunity. As shown above, when Hedger heard the gunshots, he had reason to believe that Graves posed an imminent, mortal threat to the officers under his command, which would have made the use of lethal force in response proportionate. Since we do not judge officers' actions "with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396, that justification for lethal force did not disappear in the moments between when Hedger heard the gunshots and when he tasered Graves. We have held that "[w]ithin a few seconds of reasonably perceiving a sufficient danger, officers may use deadly force even if in hindsight the facts show that the persons threatened could have escaped unharmed." *Untalan v. City of Lorain*, 430 F.3d 312, 315 (6th Cir. 2005); *see, e.g.*, *Rush v. City of Lansing*, 644 F. App'x 415, 423 (6th Cir. 2016) (upholding qualified immunity where an officer shot a knife-wielding suspect in the

stomach, the suspect slumped backward, and the officer shot her in the head a few seconds later); *Mullins*, 805 F.3d at 763–64 (upholding qualified immunity where an officer threw an armed suspect to the ground, the suspect threw his gun over the officer's shoulder, and the officer shot the suspect twice within five seconds); *Untalan*, 430 F.3d at 315 (upholding qualified immunity where a suspect was shot after dropping a knife "a few seconds" prior). It follows *a fortiori* that Hedger's use of nonlethal force seven seconds after he heard gunshots was not excessive under clearly established law. The majority does not even attempt to grapple with these precedents.

The majority reaches a contrary conclusion only by "defin[ing] clearly established law at a high level of generality," which the Supreme Court "has repeatedly told courts . . . not to" do. *Emmons*, 139 S. Ct. at 503 (quoting *Kisela*, 138 S. Ct. at 1152). The majority cites caselaw for the proposition that an officer may not taser an unresisting suspect or a suspect who, although formerly resisting arrest, is now incapacitated. But the majority makes no effort to analogize Hedger's use of a taser to the facts of any prior precedent. "That is a problem" because, outside of "the rare obvious case," we must "identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *Id.* at 504.

The majority protests that "every reasonable law enforcement officer in our circuit knows that to deploy a taser against a non-resisting suspect is excessive," Maj. Op. at 17, but that is simply begging the question. In many cases, whether a suspect qualifies as "non-resisting" will not be obvious, hence the need to find a case establishing "the violative nature of [the] *particular* conduct" at issue. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *al-Kidd*, 563 U.S. at 742). Here, Hedger on the one hand could see that Graves had been shot and was seriously injured and *possibly* in shock. On the other hand, he also had reason to believe that Graves had shot at Myers just a few seconds prior, still had a gun on his person, and was possibly

still capable of firing it. Whether, under such circumstances, Graves qualified as no longer resisting is at least debatable, so in the absence of a case finding a constitutional violation under similar circumstances, Hedger must be granted qualified immunity.

None of the cases on which the majority relies squarely governs the facts of Hedger's use of a taser. In *Landis v. Baker*, an unpublished case that cannot on its own clearly establish law, an unarmed suspect grabbed an officer by the throat. 297 F. App'x 453, 456 (6th Cir. 2008). Upon being pepper-sprayed and struck with a baton, the suspect, who was mentally disturbed, walked off into the woods. *Id.* The two officers who had originally encountered the suspect called for backup. *Id.* Several minutes went by, and another officer arrived at the scene. *Id.* The officers found the suspect standing in a "water hole" and staring blankly. *Id.* The suspect did not respond to the officers' orders, and—when he did not comply—the officers converged on him, beat him ten times with a baton, knocked him over, and then tasered him five times over the course of a minute and thirty-seven seconds while he lay face down in the water. *Id.* at 457. The suspect ultimately drowned. *Id.* at 458.

These facts simply do not look like the tasering of Graves. Although the suspect in *Landis* had previously resisted arrest, several minutes had passed, and the officers had time to form a new plan and regroup. They knew the suspect was not visibly armed and that they had him surrounded; they did not have to make a split-second decision about whether the suspect's prior threat (choking an officer) had abated; it plainly had. Hedger, on the other hand, had no time to step back and consider whether the threat had abated. The specific principle that we do not second guess officers' nonlethal use of force when they had reasonably perceived a threat a few seconds prior must prevail over the general principle that an officer may not taser a non-resisting suspect. Additionally, Hedger only tasered Graves for one five-second charge, the amount of time he needed to get from

the bathroom doorway to Graves. By contrast, the officers in *Landis* tasered the suspect many times in rapid succession while the suspect lay in a position where tasering could likely—and did—lead to death.

The remaining precedents the majority cites are not even remotely analogous. *Eldridge v. City of Warren* involved the tasering of an unarmed man suspected of driving under the influence after he refused to step out of his car but did not otherwise resist. 533 F. App'x 529, 530–31 (6th Cir. 2013). And neither *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 498 (6th Cir. 2012), nor *Rudlaff v. Gillepsie*, 791 F.3d 638, 643 (6th Cir. 2015), held that an officer had violated a constitutional right. Clearly, none of these cases would have given Hedger fair notice of how much force he could have constitutionally used when he reasonably believed that Graves had shot at one of his fellow officers.

Our precedents show that Hedger's use of the taser did not violate a clearly established constitutional right. Accordingly, I would hold that Hedger is entitled to qualified immunity.

\* \* \*

I would AFFIRM the district court's grant of summary judgment to the officers in its entirety. I therefore join Part II.1 of the majority opinion and respectfully dissent from Parts II.2 and II.3.